THE HILLS DEVELOPMENT COMPANY, PLAINTIFF-RESPON-
DENT, v. THE TOWNSHIP OF BERNARDS IN THE COUNTY
OF SOMERSET, A MUNICIPAL CORPORATION OF THE
STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF
THE TOWNSHIP OF BERNARDS, THE PLANNING BOARD OF
THE TOWNSHIP OF BERNARDS, AND THE SEWERAGE AU-
THORITY OF THE TOWNSHIP OF BERNARDS, DEFEND-
ANTS-APPELLANTS.

HELEN MOTZENBECKER, PLAINTIFF-RESPONDENT, v. MAYOR
AND COUNCIL OF THE BOROUGH OF BERNARDSVILLE
AND THE BOROUGH OF BERNARDSVILLE, DEFENDANTS-
APPELLANTS.

URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NONPROF-
IT CORPORATION OF THE STATE OF NEW JERSEY, CLEVE-
LAND BENSON, JUDITH CHAMPION, BARBARA TIPPETT
AND KENNETH TUSKEY, ON THEIR OWN BEHALF AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAIN-
TIFFS-RESPONDENTS, AND FANNIE BOTTS, LYDIA CRUZ
AND JEAN WHITE, PLAINTIFFS, v. THE MAYOR AND COUN-
CIL OF THE BOROUGH OF CARTERET, MAYOR AND COUN-
CIL OF THE BOROUGH OF DUNELLEN, TOWNSHIP COMMIT-
TEE OF THE TOWNSHIP OF EAST BRUNSWICK, TOWNSHIP
COMMITTEE OF THE TOWNSHIP OF EDISON, MAYOR AND
COUNCIL OF THE BOROUGH OF HELMETTA, MAYOR AND
COUNCIL OF THE BOROUGH OF HIGHLAND PARK, MAYOR
AND COUNCIL OF THE BOROUGH OF JAMESBURG, TOWN-
SHIP COMMITTEE OF THE TOWNSHIP OF MADISON, MAYOR
AND COUNCIL OF THE BOROUGH OF METUCHEN, MAYOR
AND COUNCIL OF THE BOROUGH OF MIDDLESEX, MAYOR
AND COUNCIL OF THE BOROUGH OF MILLTOWN, TOWN-

1

SHIP COMMITTEE OF THE TOWNSHIP OF MONROE, TOWN-SHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNS-WICK, TOWNSHIP, TOWNSHIP COMMITTEE OF THE TOWN-SHIP OF PISCATAWAY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO, MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE, MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK, MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD, MAY-OR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER, MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOOD-BRIDGE, DEFENDANTS, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, DEFENDANT-APPELLANT.

GARFIELD AND COMPANY, PLAINTIFF-RESPONDENT, v. MAY-OR AND THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, A MUNICIPAL CORPORATION, AND THE MEMBERS THEREOF; PLANNING BOARD OF THE TOWN-SHIP OF CRANBURY, AND THE MEMBERS THEREOF, DE-FENDANTS-APPELLANTS.

CRANBURY LAND COMPANY, A NEW JERSEY LIMITED PART-NERSHIP, PLAINTIFF-RESPONDENT, v. CRANBURY TOWN-SHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY LOCATED IN MIDDLESEX COUNTY, NEW JERSEY, DEFENDANT-APPELLANT.

LAWRENCE ZIRINSKY, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, A MUNICIPAL CORPORATION, AND THE PLANNING BOARD OF THE TOWNSHIP OF CRANBURY, DEFENDANTS-APPEL-LANTS.

TOLL BROTHERS, INC., A PENNSYLVANIA CORPORATION, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF CRANBURY IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORA-TION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY AND THE PLANNING BOARD OF THE TOWNSHIP OF CRANBURY, DE-FENDANTS-APPELLANTS.

MORRIS COUNTY FAIR HOUSING COUNCIL, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE AD-VANCEMENT OF COLORED PEOPLE AND STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY,

PLAINTIFFS-RESPONDENTS, v. BOONTON TOWNSHIP, CHATHAM TOWNSHIP, CHESTER TOWNSHIP, EAST HANOVER TOWNSHIP, FLORHAM PARK BOROUGH, HANOVER TOWNSHIP, HARDING TOWNSHIP JEFFERSON TOWNSHIP, KINNELON BOROUGH, LINCOLN PARK BOROUGH, MADISON BOROUGH, MENDHAM BOROUGH, MENDHAM TOWNSHIP, MONTVILLE TOWNSHIP, MORRIS TOWNSHIP, MORRIS PLAINS BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY-TROY HILLS TOWNSHIP, PASSAIC TOWNSHIP PEQUANNOCK TOWNSHIP, RANDOLPH TOWNSHIP, RIVERDALE BOROUGH, ROCKAWAY TOWNSHIP, ROXBURY TOWNSHIP AND WASHINGTON TOWNSHIP, DEFENDANTS, AND DENVILLE TOWNSHIP, DEFENDANT-APPELLANT.

AFFORDABLE LIVING CORPORATION, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF DENVILLE, DEFENDANT-APPELLANT, AND SHONGUM-UNION HILL CIVIC ASSOCIATION, A NOT-FOR-PROFIT CORPORATION, INTERVENOR-RESPONDENT.

ANGELO CALI, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF DENVILLE, IN THE COUNTY OF MORRIS: A MUNICIPAL CORPORATION OF NEW JERSEY, THE MUNICIPAL COUNCIL OF THE TOWNSHIP OF DENVILLE, AND THE PLANNING BOARD OF THE TOWNSHIP OF DENVILLE, DEFENDANTS-APPELLANTS.

SIEGLER ASSOCIATES, A PARTNERSHIP EXISTING UNDER THE LAWS OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF DENVILLE, DEFENDANT-APPELLANT.

MAURICE SOUSSA AND ESTHER H. SOUSSA, PLAINTIFFS-RESPONDENTS, v. THE TOWNSHIP OF DENVILLE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, SITUATED IN MORRIS COUNTY, AND THE DENVILLE TOWNSHIP PLANNING BOARD, DEFENDANTS-APPELLANTS.

STONEHEDGE ASSOCIATES, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF DENVILLE, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE MUNICIPAL COUNCIL OF THE TOWNSHIP OF DENVILLE & THE PLANNING BOARD OF THE TOWNSHIP OF DENVILLE, DEFENDANTS-APPELLANTS.

4

REAL ESTATE EQUITIES, INC., PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF HOLMDEL, DEFENDANT-APPELLANT.

NEW BRUNSWICK–HAMPTON, INC., PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF HOLMDEL, DEFENDANT-APPELLANT.

PALMER ASSOCIATES AND GIDEON ADLER, PLAINTIFFS-RESPONDENTS, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF HOLMDEL, DEFENDANT-APPELLANT.

URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, CLEVELAND BENSON, JUDITH CHAMPION, BARBARA TIPPETT AND KENNETH TUSKEY, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, MAYOR AND COUNCIL OF THE BOROUGH OF DUNELLEN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST BRUNSWICK, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EDISON, MAYOR AND COUNCIL OF THE BOROUGH OF HELMETTA, MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLAND PARK, MAYOR AND COUNCIL OF THE BOROUGH OF JAMESBURG, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MADISON, MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN, MAYOR AND COUNCIL OF THE BOROUGH OF MIDDLESEX, MAYOR AND COUNCIL OF THE BOROUGH OF MILLTOWN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNSWICK, TOWNSHIP, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO, MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE, MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK AND MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD, MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER, MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MONROE, DEFENDANT-APPELLANT.

MONROE DEVELOPMENT ASSOCIATES, PLAINTIFF-RESPONDENT, v. MONROE TOWNSHIP, DEFENDANT-APPELLANT.

LORI ASSOCIATES, A NEW JERSEY PARTNERSHIP, AND HABD ASSOCIATES, A NEW JERSEY PARTNERSHIP, PLAINTIFFS-RESPONDENTS, v. MONROE TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, LOCATED IN MIDDLESEX COUNTY, NEW JERSEY, DEFENDANT-APPELLANT.

GREAT MEADOWS COMPANY, A NEW JERSEY PARTNERSHIP; MONROE GREENS ASSOCIATES, AS TENANTS IN COMMON; AND GUARANTEED REALTY ASSOCIATES, INC., A NEW JERSEY CORPORATION, PLAINTIFFS-RESPONDENTS, v. MONROE TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, LOCATED IN THE STATE OF NEW JERSEY, LOCATED IN MIDDLESEX COUNTY, NEW JERSEY, DEFENDANT-APPELLANT.

MORRIS COUNTY FAIR HOUSING COUNCIL, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFFS-RESPONDENTS, v. BOONTON TOWNSHIP, CHATHAM TOWNSHIP, CHESTER TOWNSHIP, DENVILLE TOWNSHIP, EAST HANOVER TOWNSHIP, FLORHAM PARK BOROUGH, HANOVER TOWNSHIP, HARDING TOWNSHIP, JEFFERSON TOWNSHIP, KINNELON BOROUGH, LINCOLN PARK BOROUGH, MADISON BOROUGH, MENDHAM BOROUGH, MENDHAM TOWNSHIP, MONTVILLE TOWNSHIP, MORRIS TOWNSHIP, MORRIS PLAINS BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY-TROY HILLS TOWNSHIP, PASSAIC TOWNSHIP, PEQUANNOCK TOWNSHIP, RIVERDALE BOROUGH, ROCKAWAY TOWNSHIP, ROXBURY TOWNSHIP AND WASHINGTON TOWNSHIP, DEFENDANTS, AND RANDOLPH TOWNSHIP, DEFENDANT-APPELLANT.

RANDOLPH MOUNTAIN INDUSTRIAL COMPLEX, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF RANDOLPH, DEFENDANT, AND THE TOWNSHIP OF RANDOLPH, A MUNICIPAL CORPORATION OF THE COUNTY OF MORRIS, STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, CLEVELAND BENSON, JUDITH CHAMPION, BARBARA TIPPETT AND KENNETH TUSKEY, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAIN-

TIFFS-RESPONDENTS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, MAYOR AND COUNCIL OF THE BOROUGH OF DUNELLEN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST BRUNSWICK, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EDISON, MAYOR AND COUNCIL OF THE BOROUGH OF HELMETTA, MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLAND PARK, MAYOR AND COUNCIL OF THE BOROUGH OF JAMESBURG, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MADISON, MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN, MAYOR AND COUNCIL OF THE BOROUGH OF MIDDLESEX, MAYOR AND COUNCIL OF THE BOROUGH OF MILLTOWN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MONROE, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNSWICK, TOWNSHIP, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO, MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE, MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK, MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER, MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS, AND MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD, DEFENDANT-APPELLANT.

AMG REALTY COMPANY, A PARTNERSHIP ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY AND SKYTOP LAND CORP., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF WARREN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

TIMBER PROPERTIES, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF WARREN, THE PLANNING BOARD OF THE TOWNSHIP OF WARREN AND THE WARREN TOWNSHIP SEWERAGE AUTHORITY, DEFENDANTS-APPELLANTS.

URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, CLEVELAND BENSON, JUDITH CHAMPION, BARBARA TIPPETT AND KENNETH TUSKEY, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, TOWNSHIP COMMITTEE OF

THE TOWNSHIP OF CRANBURY, MAYOR AND COUNCIL OF THE BOROUGH OF DUNELLEN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST BRUNSWICK, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EDISON, MAYOR AND COUNCIL OF THE BOROUGH OF HELMETTA, MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLAND PARK, MAYOR AND COUNCIL OF THE BOROUGH OF JAMESBURG, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MADISON, MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN, MAYOR AND COUNCIL OF THE BOROUGH OF MIDDLESEX, MAYOR AND COUNCIL OF THE BOROUGH OF MILLTOWN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MONROE, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNSWICK, TOWNSHIP, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO, MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE, MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK AND MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD, MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER, MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, DEFENDANT-APPELLANT.

ROBERT E. RIVELL, PLAINTIFF-APPELLANT, v. TOWNSHIP OF TEWKSBURY, A MUNICIPAL CORPORATION LOCATED IN HUNTERDON COUNTY, NEW JERSEY, DEFENDANT-RESPONDENT.

J.W. FIELD COMPANY, INC., AND JACK W. FIELD, PLAINTIFFS-RESPONDENTS, v. THE TOWNSHIP COUNCIL OF THE TOWNSHIP OF FRANKLIN AND THE TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, DEFENDANTS-APPELLANTS.

JZR ASSOCIATES, INC., A PARTNERSHIP, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF FRANKLIN; MAYOR AND COUNCIL AND PLANNING BOARD, DEFENDANTS-APPELLANTS.

FLAMA CONSTRUCTION CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF FRANKLIN AND THE TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, DEFENDANTS-APPELLANTS.

WHITESTONE CONSTRUCTION, INC., PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF FRANKLIN, AND TOWNSHIP OF FRANKLIN, DEFENDANTS-APPELLANTS.

BRENER ASSOCIATES AND HELEN BRENER SMITH, PLAINTIFFS-RESPONDENTS, v. TOWNSHIP OF FRANKLIN IN THE COUNTY OF SOMERSET, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF FRANKLIN, AND THE PLANNING BOARD OF THE TOWNSHIP OF FRANKLIN, DEFENDANTS-APPELLANTS, AND THE TOWNSHIP OF FRANKLIN SEWERAGE AUTHORITY AND THE FRANKLIN TOWNSHIP WATER UTILITY, DEFENDANTS.

RAKECO DEVELOPERS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MAYOR AND COUNCIL OF THE TOWNSHIP OF FRANKLIN AND THE TOWNSHIP OF FRANKLIN, DEFENDANTS-APPELLANTS.

WOODBROOK DEVELOPMENT COMPANY, INC., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, DEFENDANT-APPELLANT.

LEO MINDEL, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF FRANKLIN, A MUNICIPAL CORPORATION LOCATED IN SOMERSET COUNTY, NEW JERSEY, DEFENDANT-APPELLANT.

R.A.S. LAND DEVELOPMENT COMPANY, INC., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, DEFENDANT-APPELLANT.

JOPS COMPANY, PLAINTIFF-RESPONDENT, v. THE TOWNSHIP OF COUNCIL OF THE TOWNSHIP OF FRANKLIN, THE TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, AND THE PLANNING BOARD OF THE TOWNSHIP OF FRANKLIN, DEFENDANTS-APPELLANTS.

Argued in Part and Submitted in Part
January 6 and 7, 1986—Decided February 20, 1986.

12 

*James E. Davidson* argued the cause for appellants (A–122) (*Farrell, Curtis, Carlin & Davidson* and *Kerby, Cooper, Schaul & Garvin,* attorneys; *James E. Davidson, Arthur H. Garvin, III,* and *Howard P. Shaw* on the briefs).

*Edward J. Buzak* argued the cause for appellant (A–128) (*Edward J. Buzak,* attorney; *Edward J. Buzak, Valerie K. Bollheimer* and *Deborah McKenna Zipper,* on the brief).

*Stephan F. Hansbury* argued the cause for appellant (A–125) (*Harper & Hansbury,* attorneys).

*William C. Moran, Jr.* and *Ronald L. Reisner* argued the cause for appellant (A–124) (*Huff, Moran & Balint,* attorneys).

*Thomas J. Beetel* argued the cause for appellant (A–132) (*Thomas J. Beetel,* attorney; *Thomas J. Beetel* and *Robert M. Purcell,* on the brief).

*J. Albert Mastro* submitted a brief on behalf of appellants (A–123).

*Ronald L. Reisner* submitted a brief on behalf of appellant (A–126) (*Gagliano, Tucci, Iadanza and Reisner,* attorneys; *S. Thomas Gagliano,* of counsel).

*Mario Apuzzo* submitted a letter brief on behalf of appellant (A–127).

*Frank A. Santoro* submitted a brief on behalf of appellant (A–129).

*John E. Coley, Jr.* submitted briefs on behalf of appellants (A–130) (*Kunzman, Coley, Yospin & Bernstein,* attorneys; *Steven A. Kunzman,* on the briefs).

*Philip Lewis Paley* submitted briefs on behalf of appellant (A–131) (*Kirsten, Friedman & Cherin,* attorneys; *Philip Lewis Paley* and *Lionel J. Frank,* on the briefs).

*Thomas J. Cafferty* submitted briefs on behalf of appellant Franklin Township (A–133) (*McGimpsey & Cafferty,* attorneys; *Thomas J. Cafferty, A.F. McGimpsey, Jr.,* and *David Scott Mack,* on the briefs).

*William T. Cooper* submitted a letter on behalf of appellant Franklin Township Planning Board (A–133) relying on the briefs of the other appellant on the appeal.

*Richard Dieterly* argued the cause for respondent (A–132) (*Gebhardt & Kiefer,* attorneys; *Richard Dieterly* and *Sharon Handrock Moore,* on the briefs).

*Irwin I. Kimmelman,* Attorney General of New Jersey, argued the cause *pro se* as an intervenor-respondent in all appeals (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* First Assistant Attorney General, and *Deborah T. Poritz,* Deputy Attorney General, of counsel; *Edward J. Boccher, Michael J. Haas, Ross Lewin,* and *Nancy B. Stiles,* Deputy Attorneys General, on the brief).

*Stephen Eisdorfer,* Assistant Deputy Public Advocate, argued the cause for respondents Morris County Fair Housing Council, et al. (A–125) and submitted a brief as to that appeal and all other appeals on behalf of the Public Advocate (*Alfred A. Slocum,* Acting Public Advocate, attorney).

*John M. Payne* argued the cause for respondents Urban League of Greater New Brunswick, et al. (A–124/127/129/131) on behalf of the American Civil Liberties Union of New Jersey (*John M. Payne* and *Eric Neisser,* attorneys).

*Carl S. Bisgaier* argued the cause for respondent Cranbury Land Co. (A–124) and submitted briefs on behalf of respondents Real Estate Equities, Inc. (A–126) and Monroe Development Association (A–127) (*Bisgaier and Pancotta,* attorneys).

*William S. Warren* argued the cause for respondent Garfield & Co. (A–124) (*Warren, Goldberg, Berman & Lubitz,* attorneys).

*Henry A. Hill* argued the cause for respondent (A–122) (*Brener, Wallack & Hill,* attorneys; *Henry A. Hill, Thomas F. Carroll* and *Guliet D. Hirsch,* on the brief).

*Guliet D. Hirsch* argued the cause for respondent Stonehedge Associates (A–125) and submitted letter briefs on behalf of respondent Brener Associates (A–133) (*Brener, Wallack & Hill,* attorneys).

*Douglas K. Wolfson* argued the cause for respondent Siegler Associates (A–125) and a joint brief was submitted by *Douglas*

*K. Wolfson,* on behalf of respondents Helen Motzenbecker (A–123), Siegler Associates (A–125), Rakeco Developers, Inc. (A–133), and New Brunswick-Hampton, Inc. (A–126), *Francis P. Linnus* on behalf of respondent JZR Associates, Inc. (A–133) and *Frederick C. Mezey* on behalf of respondent Flama Construction Co. (A–133) (*Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Lanfrit & Linnus,* and *Mezey & Mezey,* attorneys; *Douglas K. Wolfson, Jeffrey R. Surenian, Francis P. Linnus, Mark A. Razzano, Frederick C. Mezey,* and *Jeffrey L. Shanaberger,* on the brief).

*Richard T. Sweeney* argued the cause for respondent Randolph Mountain Industrial Complex (A–128) (*Sears, Pendleton & Sweeney,* attorneys).

*Michael J. Herbert* submitted letter briefs on behalf of respondent Lawrence Zirinsky (A–124) (*Sterns, Herbert & Weinroth,* attorneys).

*Arthur Penn* submitted a brief on behalf of respondent Affordable Living Corporation (A–125) (*Shain, Scheffer & Rafanello,* attorneys).

*Nicholas E. Caprio* submitted a letter brief on behalf of respondent Angelo Cali (A–125) (*Harkavy, Goldman, Goldman & Caprio,* attorneys).

*Alan Ruddy* submitted a brief on behalf of respondents Maurice and Esther Soussa (A–125) (*Citrino, DiBiasi & Katchen,* attorneys; *Barney K. Katchen,* of counsel).

*Lewis Goldshore* submitted a letter brief on behalf of intervenor-respondent Shongrum-Union Hill Civic Association (A–125) (*Goldshore & Wolfe,* attorneys; *Nielsen V. Lewis,* of counsel and on the brief).

*J. Peter Sokol* submitted a letter on behalf of respondents Palmer Associates, et al. (A–126), relying on the briefs filed by the other respondents on the appeal (*McOmber & McOmber,* attorneys).

*Arnold K. Mytelka* submitted a letter brief on behalf of respondents Lori Associates and HABD Associates (A–127) (*Clapp and Eisenberg,* attorneys).

*Ronald L. Shimanowitz* submitted a letter brief on behalf of respondent Great Meadows Company (A–127) (*Hutt, Berkow & Jankowski,* attorneys).

*Joseph E. Murray* submitted briefs on behalf of respondents AMG Realty Company and Skytop Land Corp. (A–130) (*McDonough, Murray & Korn,* attorneys).

*Raymond R. Trombadore* submitted a letter on behalf of respondent Timber Properties (A–130) relying on the briefs filed by the other respondents on the appeal (*Raymond R. and Ann W. Trombadore,* attorneys).

*Kenneth E. Meiser* submitted briefs on behalf of respondent J.W. Field Company, Inc. (A–133) (*Frizell & Pozycki,* attorneys; *Kenneth E. Meiser* and *David J. Frizell,* on the briefs).

*Herbert J. Silver* submitted a letter on behalf of respondent Whitestone Construction, Inc. (A–133) relying on the briefs filed by the other respondents on the appeal. *Allen Russ* submitted a letter on behalf of respondent Jops Company (A–133), relying on the briefs of the other respondents on the appeal.

*Steven L. Sacks-Wilner,* Chief Counsel, argued the cause for *amici curiae* New Jersey General Assembly and New Jersey Senate Minority in all appeals.

The opinion of the Court was delivered by

WILENTZ, C.J.

In this appeal we are called upon to determine the constitutionality and effect of the "Fair Housing Act" (*L.*1985, *c.* 222), the Legislature's response to the *Mount Laurel* cases.[1] The Act creates an administrative agency (the Council on Afforda-

---

[1]*Burlington County N.A.A.C.P. v. Mount Laurel,* 67 *N.J.* 151 (1975) (*Mount Laurel I*), and *Southern Burlington County N.A.A.C.P. v. Mount Laurel,* 92 *N.J.* 158 (1983) (*Mount Laurel II*).

ble Housing) with power to define housing regions within the state and the regional need for low and moderate income housing, along with the power to promulgate criteria and guidelines to enable municipalities within each region to determine their fair share of that regional need. The Council is further empowered, on application, to decide whether proposed ordinances and related measures of a particular municipality will, if enacted, satisfy its *Mount Laurel* obligation, *i.e.*, will they create a realistic opportunity for the construction of that municipality's fair share of the regional need for low and moderate income housing. *Southern Burlington County N.A. A.C.P. v. Mount Laurel*, 92 *N.J.* 158, 208–09 (1983). The agency's determination that the municipality's *Mount Laurel* obligation has been satisfied will ordinarily amount to a final resolution of that issue; it can be set aside in court only by "clear and convincing evidence" to the contrary. § 17a. The Act includes appropriations and other financial means designed to help achieve the construction of low and moderate income housing.

In order to assure that the extent and satisfaction of a municipality's *Mount Laurel* obligation are decided and managed by the Council through this administrative procedure, rather than by the courts, the Act provides for the transfer of pending and future *Mount Laurel* litigation to the agency. Transfer is required in all cases except, as to cases commenced more than 60 days before the effective date of the Act (July 2, 1985), when it would result in "manifest injustice to any party to the litigation." § 16.

The statutory scheme set forth in the Act is intended to satisfy the constitutional obligation enunciated by this Court in the *Mount Laurel* cases. *Mount Laurel II, supra*, 92 *N.J.* at 208; *Mount Laurel I, Burlington County N.A.A.C.P. v. Mount Laurel*, 67 *N.J.* 151, 174–75 (1975). The Act includes an explicit declaration to that effect in section 3.

## I.

### Overview of Act; Summary of the Court's Decision

The Act that we review and sustain today represents a substantial effort by the other branches of government to vindicate the *Mount Laurel* constitutional obligation. This is not ordinary legislation. It deals with one of the most difficult constitutional, legal and social issues of our day—that of providing suitable and affordable housing for citizens of low and moderate income. In *Mount Laurel II*, we did not minimize the difficulty of this effort—we stressed only its paramount importance—and we do not minimize its difficulty today. But we believe that if the Act before us works in accordance with its expressed intent, it will assure a realistic opportunity for lower income housing in all those parts of the state where sensible planning calls for such housing.

Most objections raised against the Act assume that it will not work, or construe its provisions so that it cannot work, and attribute both to the legislation and to the Council a mission, nowhere expressed in the Act, of sabotaging the *Mount Laurel* doctrine. On the contrary, we must assume that the Council will pursue the vindication of the *Mount Laurel* obligation with determination and skill. If it does, that vindication should be far preferable to vindication by the courts, and may be far more effective.

Instead of depending on chance—the chance that a builder will sue—the location and extent of lower income housing will depend on sound, comprehensive statewide planning, developed by the Council and aided by the State Development and Redevelopment Plan (SDRP) to be prepared by the newly formed State Planning Commission pursuant to *L.*1985, *c.* 395. Conceptually, the Fair Housing Act is similar to CAFRA (Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21), the Pinelands Act (Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29), and the Meadowlands Act (Hackensack Meadowlands Reclamation & Development Act, *N.J.S.A.* 13:17–1 to –86), in its regional

approach to questions of appropriate land use. Its statewide scope is an extensive departure from the unplanned and uncoordinated municipal growth of the past.

The Council will determine the total need for lower income housing, the regional portion of that need, and the standards for allocating to each municipality its fair share. The Council is charged by law with that responsibility, imparting to it the legitimacy and presumed expertise that derives from selection by the Governor and confirmation by the Senate, in accordance with the will of the Legislature. Instead of varying and potentially inconsistent definitions of total need, regions, regional need, and fair share that can result from the case-by-case determinations of courts involved in isolated litigation, an overall plan for the entire state is envisioned, with definitions and standards that will have the kind of consistency that can result only when full responsibility and power are given to a single entity. Municipalities will have both the means and motives to determine, using the same standards, what is required of them, what their fair share is, and what combination of ordinances and other measures will achieve that fair share. The means consist of the rules, criteria, and guidelines of the Council, along with the Council's determination that the municipal fair share plan complies, or, if it does not, what steps must be taken. The motives are the municipalities' strong preference to exercise their zoning powers independently and voluntarily as compared to their open hostility to court-ordered rezoning; the motives also include the municipalities' desire to avoid such litigation, a goal best achieved by voluntary compliance through conformance with the standards adopted by the Council.

The Council's work is intended to produce ordinances and other measures that will fit together as part of a statewide plan, among other things, a plan that provides a real chance, a realistic "likelihood," *Mount Laurel II*, 92 *N.J.* at 222, for the construction or rehabilitation of lower income housing. And where necessary, financing may be available to help, for the

Act includes appropriations and other financial measures that will provide needed subsidies. §§ 20, 21, 33.

The Act recognizes that zoning and planning for lower income housing is a long-range task, that goals must be changed periodically, revisions made accordingly, and results regularly evaluated. This continuing nature of the planning process is given explicit recognition in the Act. See, *e.g.*, sections 6a, 7.

When supplemented by the SDRP, the Act amounts to an overall plan for the state, rationally conceived, to be implemented through governmental devices that hold the promise that the outcome—the provision of lower income housing—will substantially conform to the plan. It is a plan administered by an administrative agency with a broad grant of general power, providing the flexibility necessary for such an undertaking; it is a plan that will necessarily reflect competing needs and interests resolved through value judgments whose public acceptability is based on their legislative source. Most important of all to the success of the plan is this public acceptance and, hence, the municipal acceptance that it should command.

That is the general outline of how this Act and the Council created by it are intended to operate, and the results they are intended to achieve. It is a description at variance with the prediction of some who oppose the Act. Our opinion and our rulings today, significantly reducing the courts' function in this field, are based on this outline, based, that is, on the Council's ability, through the Act, to approach the results described above. If, however, as predicted by its opponents, the Act, despite the intention behind it, achieves nothing but delay, the judiciary will be forced to resume its appropriate role.

This Act represents an unprecedented willingness by the Governor and the Legislature to face the *Mount Laurel* issue after unprecedented decisions by this Court.[2] Even with ordi-

---

[2] One of the most experienced public interest attorneys in this field (now representing a builder) described it as follows: "The Act stands today as the

nary legislation, the rule is firmly settled that a law is presumed constitutional. *Mahwah Township. v. Bergen County Bd. of Taxation,* 98 *N.J.* 268, 282 (1985); *Paul Kimball Hosp. v. Brick Township.,* 86 *N.J.* 429, 446–47 (1981); *Brunetti v. New Milford,* 68 *N.J.* 576, 599 (1975); *Harvey v. Essex County Bd. of Freeholders,* 30 *N.J.* 381, 388 (1959). The particularly strong deference owed to the Legislature relative to this extraordinary legislation is suggested in the following language from *Mount Laurel II* :

> [A] brief reminder of the judicial role in this sensitive area is appropriate, since powerful reasons suggest, and we agree, that the matter is better left to the Legislature. We act first and foremost because the Constitution of our State requires protection of the interests involved and because the Legislature has not protected them. We recognize the social and economic controversy (and its political consequences) that has resulted in relatively little legislative action in this field. We understand the enormous difficulty of achieving a political consensus that might lead to significant legislation enforcing the constitutional mandate better than we can, legislation that might completely remove this Court from those controversies. But enforcement of constitutional rights cannot await a supporting political consensus. So while we have always preferred legislative to judicial action in this field, we shall continue—until the Legislature acts—to do our best to uphold the constitutional obligation that underlies the *Mount Laurel* doctrine. That is our duty. We may not build houses, but we do enforce the Constitution.
>
> We note that there has been some legislative initiative in this field. We look forward to more. The new Municipal Land Use Law explicitly recognizes the obligation of municipalities to zone with regional consequences in mind, *N.J. S.A.* 40:55D–28(d); it also recognizes the work of the Division of State and Regional Planning in the Department of Community Affairs (DCA), in creating the State Development Guide Plan (1980) (SDGP), which plays an important part in our decisions today. Our deference to these legislative and executive initiatives can be regarded as a clear signal of our readiness to defer further to more substantial actions.

---

nation's foremost state legislative effort to respond to the housing needs of lower income persons. It is an extraordinary credit to the people of this State that the Act is law." Bisgaier, Plaintiff's Brief and Appendix in Opposition to Motion to Transfer at 13a, *Urban League of Greater New Brunswick v. Carteret,* (A–124–85). And one planner, often retained by the *Mount Laurel* judges, noted, in reference to its provisions for financing, that "[t]his is the first substantial commitment of general-fund revenues to low-income housing in New Jersey history." Mallach, *From Mount Laurel to Molehill: Blueprint for Delay,* N.J. Reporter, October 1985 at 27.

> The judicial role, however, which could decrease as a result of legislative and executive action, necessarily will expand to the extent that we remain virtually alone in this field. In the absence of adequate legislative and executive help, we must give meaning to the constitutional doctrine in the cases before us through our own devices, even if they are relatively less suitable. That is the basic explanation of our decisions today. [92 *N.J.* 158, at 212–14 (footnote omitted).]

The basic explanation of *today*'s decision is the Act—this substantial occupation of the field by the Governor and the Legislature. They have responded. It appears to be a significant response. It is a response more than sufficient to trigger our "readiness to defer." *Id.*

We hold that the Act is constitutional and order that all of the cases pending before us be transferred to the Council. Those transfers, however, shall be subject to such conditions as the trial courts may find necessary to preserve the municipalities' ability to satisfy their *Mount Laurel* obligation. See *infra* at 61–63. In some of the cases before us, including several where a builder's remedy was imminent, transfer will cause a substantial delay in ordinance revisions and ultimate lower income housing construction. It is possible that during this time development might occur, making future construction of lower income housing impossible, or significantly less probable. For instance, where there are very few tracts suitable for lower income housing, industrial, commercial, or non-lower income housing development on them could end the municipality's future ability to meet its *Mount Laurel* obligation; similarly, where infrastructure capacity is limited, sewerage or other resources may be exhausted, precluding future *Mount Laurel* development. The objective of these conditions is to prevent such use of scarce resources.

The balance of our opinion continues with the facts and the procedural status of the argued cases (Part II), a fuller description of the Act (Part III), a determination of the Act's constitutionality (Part IV), an analysis of the motions now before us to transfer matters to the Council (Part V), interpretation of certain sections of the Act (Part VI), an outline of possible

conditions to be imposed on the transferral of these matters, to be determined by the trial courts on remand (Part VII), and a concluding section (Part VIII).

## II.

### The Facts and the Procedural Status

There are twelve appeals pending before us, each involving the question of the validity of a trial court's decision on a motion to transfer *Mount Laurel* litigation to the Council. Transfer was denied in all but one.

We selected five of the twelve cases for oral argument, designed and structured to cover all of the issues in all of the cases. The factual presentation that follows covers only the five cases that were argued. Our review of the record in the other cases makes it clear that in terms of our ruling today, there is no material difference in those cases.[3] The five cases specifically detailed involve Bernards, Cranbury, Denville, Randolph, and Tewksbury Townships. Tewksbury is the one case before us in which transfer was granted.

*Cranbury* is the oldest of the five. Its history is found in *Urban League of Greater New Brunswick v. Borough of Carteret*, 142 *N.J.Super.* 11 (Ch.Div.1976), rev'd, 170 *N.J.Super.* 461 (App.Div.1979). The action was commenced in 1974, *before* our decision in *Mount Laurel I.* Our ultimate determination in *Mount Laurel II* dealt with this matter. There we held that Cranbury's ordinance, along with those of the other Middlesex County municipalities before us, was invalid and remanded the case for trial in accordance with our numerous rulings in *Mount Laurel II*, 92 *N.J.* at 350–51. On remand, a trial was held in April and May of 1984, the fair share determined, and an order entered on August 13, 1984, allowing 90 days for rezoning. In April of 1985, the Master, appointed by

---

[3]The Appendix to our opinion describes the other seven cases.

the court in accordance with *Mount Laurel II*, submitted a compliance report. The various reports of the parties' experts were exchanged in July of 1985. The court scheduled a hearing for December 2, 1985, on the issue of the compliance of the previously adopted ordinances. As a result of the subsequent events, mentioned below, that hearing was not held. It would have involved the measurement of the enacted ordinances against the fair share, a determination of suitability of certain sites for low and moderate income housing, the appropriate phasing in, if any, of the fair share obligation, and, assuming the enacted ordinances were not approved, a determination of the appropriate revision.

It appears that had this Court not interfered, this case might have been completed, assuming further ordinance revisions were required, by the beginning of this year. The claims of "manifest injustice" that would result from a transfer include the alleged delay in the construction of low and moderate income housing, the potential loss of suitable sites, and significantly increased infrastructure costs for developers. Both the public interest plaintiff who originally brought the suit and the builder-plaintiffs who joined it after *Mount Laurel II* claim "manifest injustice."

The *Denville* and *Randolph* cases were part of the Public Advocate's lawsuit against municipalities in Morris County. The action commenced in October of 1978, between the decisions in *Mount Laurel I* and *Mount Laurel II*. The proceedings before the trial court prior to *Mount Laurel II* were supplemented after that decision by more discovery and further court conferences. By July of 1984, when the matter was set down for trial, only three of the Morris County municipalities remained in active litigation of the case. Denville and Randolph were two of the three. After ten days of trial a tentative settlement was reached and further trial proceedings were stayed pending the implementation of that settlement.

On December 16, 1984, Denville indicated that it was no longer willing to abide by the settlement agreement. An additional day of trial was held in January 1985 (there were 10 days of trial in 1984), Denville's fair share was determined, and the municipality was ordered to rezone in conformance with *Mount Laurel*. A further interlocutory order was entered in March 1985, appointing a Master and requiring Denville to rezone in 90 days. The Master's report indicated that Denville's compliance plan would have resulted in only 12 additional lower income units (through the rehabilitation of 12 dilapidated units). During this period following our *Mount Laurel II* decision (from April 1984 to July 1985), five developers intervened, claiming builder's remedies. Three of the sites controlled by those developers were found suitable for lower income housing by the Master. The basis for claiming "manifest injustice" lies in the alleged delay in producing low and moderate income housing caused by the transfer, as well as in the builders' loss of expected profits.

Randolph had also reached a tentative agreement with the Public Advocate to settle the matter, but that settlement fell through too. There is an issue as to whether it fell through because of delays on the part of the Public Advocate, which in turn led to problems concerning the sites, or whether it was the problems concerning the sites that led to the delays. A developer interested in the matter claims that it withheld suit based on Randolph's assurance that it would receive satisfactory treatment after resolution of the suit brought by the Public Advocate. That developer (Randolph Mountain), whose prior status had been as an intervenor, ultimately filed its own complaint after the adoption of the Act. The only claim of "manifest injustice" lies in the alleged delay that would result in the production of low and moderate income housing.

*Tewksbury* is the most recent of the pending cases brought, having been filed on June 19, 1984. That suit resulted from the failure of Tewksbury's proposed rezoning to include the developer's tract in a zone that would permit multiple dwelling

housing at a density satisfactory to the developer. Extensive
discovery has occurred. The trial date, formerly set for July
1985, was adjourned in order to continue the settlement negoti-
ations. There has been no trial, nor any determination of
constitutionality, fair share, need to rezone, compliance, and so
forth. The claimed "manifest injustice" in this case arises from
the expected delay in the resolution of this matter resulting
from a transfer to the Council, and includes the duplication of
efforts already spent in this litigation, the financial burden to
the plaintiff resulting from his continuing mortgage obligation
during the Council's process, the denial of the claimed due
process right to have a court ruling on the constitutionality of
Tewksbury's ordinance, and the delay in realizing the opportu-
nity for affordable low and moderate income housing.

*Bernards Township* is the last matter on which we held oral
argument. The suit before us is the second *Mount Laurel* suit
brought by the developer, the first one having followed *Mount
Laurel I,* the second, *Mount Laurel II.* The present suit was
almost settled without any trial or discovery. Based on the
apparent settlement, the municipality sought an "immunity"
order, a device designed by one of the trial court judges to give
a municipality the opportunity to rezone in accordance with the
*Mount Laurel* obligation without having to face numerous
suits by builders claiming a builder's remedy.[4] Through such

---

[4]In *Mount Laurel II* we held that a "builder's remedy" would ordinarily be
granted where a developer had brought suit that resulted in the invalidation of
a municipal zoning ordinance on *Mount Laurel* grounds and in the adoption of
a conforming ordinance. 92 *N.J.* 158 at 279–280. Assuming that the builder's
tract and proposed project substantially conformed to sound zoning and
planning and had no substantial adverse environmental impact, our decision
instructed the trial court to order the municipality to grant all necessary
permits to build the project, provided that it contained a substantial proportion
of low and moderate income housing.

In *Mount Laurel II* we suggested that a 20% figure would be a "reasonable
minimum" in deciding what would be a "substantial proportion" in any given
case. *Id.* at 279 n. 3. As a matter of practice the grant of builder's remedies
has almost invariably been for projects 80% of whose units are middle income

an order the court allows the municipality 90 days to rezone (the municipality conceding the invalidity of its then zoning ordinance) either with or without a builder's remedy, depending on whether a builder is a party or otherwise involved at that time. In the meantime (and this is the advantage of the order) no builders may commence suit. If the rezoning conforms to the *Mount Laurel* obligation, the court renders a judgment protecting the municipality for a six year period against the requirement of any further relief, including any further builder's remedies.

The deadline in Bernards' immunity order was extended from time to time to a date well after the effective date of the Act. Ultimately, Bernards decided not to go through with the settlement and thereafter filed a motion for transfer to the Council. The developer (Hills Development Company) by that time had expended substantial sums. The municipality had adopted an ordinance that appeared to comply with the *Mount Laurel* obligation. The developer alleges not only substantial expenditures that will be wasted if the builder's remedy that was part of the settlement is not granted, but further asserts that it has entered into numerous contractual arrangements that will cause it serious harm if the project is delayed or prohibited. The potential of a two-year delay allegedly would drastically affect the builder's business operations, which have depended on high-volume production. The "manifest injustice," therefore, in this matter consists not only of the delay in providing low and moderate income units (Hills claims it could produce

or higher and 20% lower income. This has led to the conclusion that granting a builder's remedy results in excessive growth, typically a requirement that the builder be allowed to construct 4 units of middle or upper income housing for every unit of lower income housing that is required. By that analysis a *Mount Laurel* fair share of a certain number of lower income units is viewed as requiring the municipality to build, in the aggregate, five times that number.

The requirement that a substantial proportion of the total units built consist of lower income units is known as a "mandatory set aside."

550 by 1990) but significant actual and potential damage to the builder.

As noted above the Act's effective date was July 2, 1985. Shortly thereafter, various motions were made in numerous cases, pursuant to the Act, to transfer the matters to the Council and hearings on those motions were held. In these five cases the motion for transfer was granted only for Tewksbury, and denied in the four others (as well as in all other cases before us). Following that denial many municipalities sought leave to appeal to the Appellate Division along with a stay of further proceedings at the trial level. In Tewksbury's case it was the developer who appealed from the order granting transfer. We have certified all of these appeals directly from the trial courts and, where requested, have entered a stay of all further proceedings at the trial level.

The issue before us in each of these cases is the trial court's order on the motion for transfer. Numerous builders have also challenged the constitutionality of the Act, their position being that even if transfer should have been granted, the matter should proceed in court since the Act is unconstitutional. Along with the attack on the Act in its entirety are claims that various sections are unconstitutional. As suggested above the central issue in the transfer motions is the meaning of "manifest injustice."

### III.

### Description of Act

The Act provides a statutory method designed to enable every municipality in the state to determine and to provide for its fair share of its region's need for low and moderate income housing. It creates a Council to achieve this result. During

the first seven months after its formation,[5] the Council is to divide the state into housing regions and determine, for each region (as well as for the state itself), the present and prospective need for low and moderate income housing, § 7a and b. It is also required during that period to adopt "criteria and guidelines" that will enable municipalities to determine their fair share of their region's housing need. § 7c. The Act contemplates that these criteria and guidelines, applied generally to all municipalities in the state, will result in a tentative fair share number for each municipality, calculated by the municipality, and thereafter adjusted by the municipality in accordance with various specific factors set forth in section 7c(2). One of those factors is the consistency of the fair share determination with the SDRP, the overall master plan of the State. § 7c(2)(e). That provision, when read together with this new State planning act, *L.*1985, *c.* 395, contemplates the use of a statewide plan that will indicate where development and redevelopment is to take place or is to be encouraged, and where it is to be limited, including the appropriate kinds of development. The plan, insofar as the *Mount Laurel* doctrine is concerned, can be thought of as probably largely replacing the initial concept of "developing municipalities" and the subsequent use of the State Development Guide Plan in determining the locus of the *Mount Laurel* fair share obligation.[6]

The power of the Council is extremely broad. While it is required, in performing these functions, to consider "pertinent research studies, government reports, decisions of other branches of government, implementation of the State Develop-

---

[5]Actually the seven month period runs either from January 1, 1986, or from the date when the last member of the Council is confirmed, whichever is earlier. Since the last member of the Council was confirmed on January 12, 1986, the seven month period is measured from January 1, 1986.

[6]Until the SDRP is completed, the Council, through the guidelines, criteria and adjustments of section 7, presumably will determine the locus of the obligation and its intensity without the benefit of the Plan.

ment and Redevelopment Plan ... and public comment," § 7, it is not restricted to any particular approach to these matters nor to any school of thought espoused by groups of experts. It is free to look at the matter and decide it based on its own determination of appropriate policy, given the purposes of the Act.

The Act contemplates that the Council will periodically adjust its regional need figures.[7] In other words, the Council is not required to make a static determination by August 1, 1986, but rather the *first* determination of the major facts and standards that will enable municipalities to determine their fair share at that time, the Council's determination to be revised "from time to time" in accordance with changing needs and changing circumstances. § 7. The Act contemplates that the information and criteria adopted by the Council at any given time will result in municipal fair share ordinances, revision of which should be considered after six years. That is the same period (six years) used in the Municipal Land Use Law requiring periodic revisions of municipal master plans, *N.J.S.A.* 40:55D–89, and the period used by this Court in *Mount Laurel II*, during which a zoning ordinance complying with the *Mount Laurel* obligation would be protected from attack. 92 *N.J.* at 291–92.

Any municipality (assuming it has filed a resolution of participation, a housing element, and a proposed fair share housing ordinance implementing the housing element, § 9a) may petition the Council for "substantive certification" of the housing element and ordinances. § 13. The housing element "shall contain an analysis demonstrating that it will provide ... a realistic opportunity [for its fair share of low and moderate

---

[7]"It shall be the duty of the Council ... *from time to time* ... to (a) Determine housing regions of the State, (b) Estimate the present and prospective need for low and moderate income housing at the State and regional level, (c) Adopt criteria and guidelines" for determining municipal fair share. § 7 to 7c (emphasis supplied).

income housing], and the municipality shall establish that its land use and other relevant ordinances have been revised to incorporate provisions for low and moderate income housing." § 11a.[8] The Council is required to issue "substantive certification" if no objection to certification is filed with it within 45 days of publication of notice of the municipality's petition and if it finds that the fair share plan "is consistent with the rules and criteria adopted by the Council" and makes "the achievement of the municipality's fair share of low and moderate income housing realistically possible." §§ 14 to 14b. The municipality is to adopt all of its proposed ordinances within 45 days after it receives "substantive certification." § 14.

If there are any objections to substantive certification, the Act mandates a "mediation and review" process. § 15a. If the objections cannot be resolved by this mediation process involving the Council, the municipality, and the objectors, the matter is referred to an Administrative Law Judge, heard as a contested matter, and expedited. § 15c. The final determination on the issue of substantive certification is then made by the Council after receipt of the Administrative Law Judge's initial decision. *Id.*

These administrative proceedings achieve two main goals. First, those municipalities that petition the Council and thereafter receive substantive certification will promptly (within 45 days, § 14) enact the proposed ordinances and other measures that led to substantive certification, measures that presumably will achieve a realistic opportunity for the construction of the

---

[8]The housing element takes on added importance by virtue of two significant amendments to the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 *et seq.* First, the Act provides that any housing plan element contained in a municipality's Master Plan, under *N.J.S.A.* 40:55D–28, will be the same as the housing plan under the Act. § 29. A second change provides that no governing body may adopt or amend a zoning ordinance, under *N.J.S.A.* 40:55D–62, until and unless a housing plan has been adopted, and then only if the ordinance is "substantially consistent" with the housing plan, or if certain procedures are followed to justify any inconsistency. § 30.

municipalities' fair share of low and moderate income housing. Second, in any lawsuit attacking a municipality's ordinances that have received substantive certification as not in compliance with the *Mount Laurel* constitutional obligation, the plaintiff will be required to prove such noncompliance by clear and convincing evidence, and the Council shall be made a party to any such lawsuit. § 17a. The difficulties facing any plaintiff attempting to meet such a burden of proof are best understood by noting the variety of methodologies that can be used legitimately to determine regional need and fair share as well as the many different ways in which a realistic opportunity to achieve that fair share may be provided. If the Council conscientiously performs its duties, including determining regional need and evaluating whether the proposed adjustments and ordinances provide the requisite fair share opportunity, a successful *Mount Laurel* lawsuit should be a rarity. There is therefore a broad range of municipal action that will withstand challenge, given this burden of proof.

Substantive certification becomes a most important goal for any municipality concerned with the potential result of *Mount Laurel* litigation brought against it. By using the procedures of the statute, the municipality will obtain the benefit of the Council's determination of both regional need and standards for determining its fair share of that need. By complying with the requirements for substantive certification the municipality will be relieved of the uncertainties and potential burdens of *Mount Laurel* litigation.

The fact that municipalities are not *required* by this legislation to petition for substantive certification is somewhat less significant than appears at first glance. Substantive certification is of considerable importance. If the municipality fails to adopt a resolution of participation within four months of the effective date of the Act, and then later fails to file its fair share plan and housing element with the Council prior to the institution of *Mount Laurel* litigation, it may lose the benefit of substantive certification. § 9b. It will be subject to litigation

and the remedies provided by *Mount Laurel II,* the replacement of which by the administrative procedures of the Council was one of the primary purposes of the Act. § 3. It can therefore fairly be assumed that most municipalities that have a potentially significant *Mount Laurel* obligation will file their petition for substantive certification, their housing element, and fair share housing ordinance within a reasonable period of time after the Council's adoption of its criteria and guidelines.[9]

Thus, what appears at first to be simply an option available to municipalities is more realistically a procedure that practically all municipalities with a significant *Mount Laurel* obligation will follow, both to determine and to satisfy their *Mount Laurel* obligation. Furthermore, it is a procedure that may be concluded much more quickly than ordinary *Mount Laurel* litigation since the time periods provided for are extremely short. For instance, the Administrative Law Judge is required to render a decision within 90 days of "transmittal of the matter as a contested case to the Office of Administrative Law by the Council," § 15c; and the municipality is required to adopt its fair share housing ordinance within 45 days of the grant of substantive certification, § 14.

While there is the inevitable start-up delay (the Council's criteria and guidelines need not be adopted until August 1, 1986, and the Act allows municipalities five months after the adoption of the criteria to complete the necessary and sometimes time-consuming process of shaping their ordinances and housing elements, § 9a), it is quite possible that once the administrative gears start to move, a very substantial number of municipal fair share plans will be filed, certified, and thereafter adopted. That means, if the Act works according to its apparent intent, that within the not-too-distant future most municipalities subject to *Mount Laurel* obligations will have

---

[9]Indeed, 182 municipalities (as of February 14, 1986) have already filed their notice of intent (§ 9) to use the Council's procedures.

conforming ordinances in place providing a realistic opportunity for the construction of their fair share of the region's need for low and moderate income housing. Considering the fact that the Council has the power to refuse substantive certification unless that opportunity *is* realistic, and the further fact that various financial aids to construction are provided for in the Act, it also means that lower income housing should actually be built.

This statutory scheme addresses the main needs delineated in our prior decisions on this matter, namely, the consistency on a statewide basis of the determination of regional need, fair share, and the adequacy of the municipal measures. Furthermore, the decisions and actions by the Council will follow the contours of the SDRP (when completed), explicitly designed for this purpose, among others. Revisions, adjustments, fine tuning—all of the techniques available to an administrative agency—can be implemented on a statewide basis as experience teaches the Council what works and what does not. The risk that discordant development might result if *Mount Laurel* cases continue to be decided by the courts is minimized by the considerations noted above, which lead to the conclusion that most municipalities will use the Council's procedures. Furthermore, the judiciary, assuming the statutory plan functions reasonably effectively, will be responsive to the actions of the Council and conform *its* decisions in this field to the Council's various determinations.

There are other significant provisions of the Act. One allows municipalities to share *Mount Laurel* obligations by entering into regional contribution agreements. § 12. This device requires either Council or court approval to be effective. Under this provision, one municipality can transfer to another, if that other agrees, a portion, under 50%, of its fair share obligation, the receiving municipality adding that to its own. The Act contemplates that the first municipality will contribute funds to the other, § 12d, presumably to make the housing construction possible and to eliminate any financial burden resulting from

the added fair share. The provisions seem intended to allow suburban municipalities to transfer a portion of their obligation to urban areas (*see* § 2g, evincing a legislative intent to encourage construction, conversion, or rehabilitation of housing in urban areas), thereby aiding in the construction of decent lower income housing in the area where most lower income households are found, provided, however, that such areas are "within convenient access to employment opportunities," and conform to "sound comprehensive regional planning." § 12c.

Probably the most significant provision involved in these appeals is section 16, dealing with the transfer of *Mount Laurel* litigation to the Council. Section 16b requires that *all* such litigation commenced after the effective date of the Act (or no more than 60 days before that date) shall, on motion of any party, be transferred automatically to the Council. All of the procedures and determinations mentioned above leading to "substantive certification" would be triggered and thereafter take place.[10] The courts, in other words, would have nothing more to do with the determination and satisfaction of the *Mount Laurel* obligation unless and until either a challenge was subsequently made to that "substantive certification," or such certification was denied. As for *Mount Laurel* litigation commenced more than 60 days before the effective date of the Act, section 16 provides that all of those cases, on motion of "any party to the litigation," are required to be transferred to the Council, unless such transfer "would result in a manifest injustice to any party to the litigation." It is the meaning of this latter clause and the phrase "manifest injustice" that is one of the main issues before us.

The last provision of the Act we shall describe concerns the builder's remedy. The Act prohibits any court from imposing a builder's remedy on a municipality until five months after the

---

[10]A transfer motion under section 16, if granted, should also be regarded as a petition for substantive certification.

Council adopts its criteria and guidelines. § 28. If the Council takes all the time allowed under the Act for that purpose (it has until August 1, 1986, to adopt those criteria and guidelines), the builder's remedy moratorium would expire on January 1, 1987. That date is also the deadline for municipalities to file their housing element and fair share housing ordinance with the Council without the risk of a *Mount Laurel* lawsuit. § 9. This moratorium against court issuance of a builder's remedy does not apply to any litigation commenced before January 20, 1983, the date of our *Mount Laurel II* opinion, nor to any litigation in which there has been a "final judgment" with "all right to appeal exhausted." *Id.*

Since one of the issues claimed by some of the parties as being most important in determining "manifest injustice" is the delay said to be caused in the satisfaction of the *Mount Laurel* obligation by transfer to the Council, we should point out the various timetables that are relevant to that claim. Measured from *today*, a matter transferred to the Council will presumably result in a conforming municipal housing element and fair share zoning ordinances around September of 1987; [11] if the Council promulgates its criteria and guidelines in less than seven months, that outside period would become that much shorter. If we are measuring, however, from a date after the Council has its guidelines and criteria in place, the time it would take from the filing of a petition for substantive certification to the adoption of a conforming fair share housing ordinance could be considerably shorter than the time for *Mount Laurel* litigation, which seems to require at least one-and-a-half to two years' time for conclusion.

---

[11]This was the estimate given by one of the trial courts below, on the assumption that the matter would require referral to an Administrative Law Judge pursuant to Section 15c. The other trial court concluded, on a similar assumption, that the Council would be able to grant substantive certification by September 1987, the conforming ordinances presumably to be adopted thereafter.

If the critical issue is the amount of time it will take to litigate a particular *Mount Laurel* case, resulting in a conforming ordinance, one must obviously look at its present status. If a compliance hearing is about to be held and the parties are close to agreement, the matter might be concluded in a month. On the other hand, if no fair share hearing has been held and there has been little discovery, a year might still be required.

It seems fair to conclude that the resolution of many of these matters before us would occur more quickly if transfer were denied. None of the foregoing calculations takes into account the effect of any appeals nor the probability that such appeals would be forthcoming.

## IV.

### Constitutionality of Act

The main challenges to the Act's constitutionality are based on a measurement of the Act against the *Mount Laurel* constitutional obligation. It is also asserted that this legislation impermissibly interferes with the Court's exclusive power over prerogative writ actions. We hold that the Act, as interpreted herein, is constitutional.

A major claim is that the Act is unconstitutional because it will result in delay in the satisfaction of the *Mount Laurel* obligation. That claim is based on a totally false premise, namely, that there is some constitutional timetable implicit in that obligation. The constitutional obligation itself, as we made clear in *Mount Laurel I,* was implicit in the police power exercised in all zoning decisions, and inherent in our Constitution's guarantees of "substantive due process and equal protection of the laws." *Mount Laurel I,* 67 *N.J.* at 174–75; *Mount Laurel II,* 92 *N.J.* at 208–09. The misunderstanding we encounter today undoubtedly is based on our many calls for swift action in *Mount Laurel II,* on the various references to the delay previously experienced in the implementation of the

*Mount Laurel* obligation in the courts, and on the determination, reaffirmed in numerous places in *Mount Laurel II,* not to allow any further delay. All of these concerns were expressed when the constitutional obligation was being enforced only through judicial intervention. It was the total disregard by municipalities of the judiciary's attempts to enforce the obligation, and the interminable delay where litigation was in process, that formed the background for those comments.

█ Nowhere in the *Mount Laurel II* opinion is there any suggestion that there was some deadline after which legislation would not be acceptable; nowhere is there the slightest suggestion that legislation, in order to be acceptable, would have to result in ordinances or lower income housing by a certain date. What the opinion did contain, however, was the strongest possible entreaty to the Legislature, seeking legislation on this subject. *Mount Laurel II,* 92 *N.J.* at 212–14. It would be totally inconsistent with that entreaty now to rule that this welcome entry of the Legislature in this area of the law is somehow unconstitutional because the remedies of the Act, so long sought by the judiciary, will somehow not result in ordinances or housing quickly enough.

The delay caused by the Act represents the time needed by the Council to do its job well. Furthermore, it is quite possible that the Act will work more quickly than the judicial procedure, will result in more conforming municipal ordinances, in the aggregate, than would be obtained through litigation, and may ultimately result in more lower income housing than the courts could have achieved. The work of this Act cannot be judged by what it will accomplish in its first year, nor by its effect on a limited number of municipalities. It is its probable long-term impact and its impact on *all* municipalities that counts.

If delay is the factor that is to determine the Act's constitutionality, then, given the intractability of the problem and given the preferred legislative solution, the question must be whether this Act appears designed to accomplish satisfaction of the

constitutional obligation within a reasonable period. We conclude that it does.

■ The next claim is that the builder's remedy moratorium is unconstitutional since that remedy is part of the constitutional obligation. This claim suffers from two deficiencies. First, the moratorium on builder's remedies imposed by section 28 is extremely limited, as explained *infra* at 60; our courts have, in analogous contexts, upheld the power to enact a reasonable moratorium. *Deal Gardens, Inc. v. Loch Arbor Bd. of Trustees,* 48 *N.J.* 492, 499 (1967); *New Jersey Shore Builders v. Township of Ocean,* 128 *N.J.Super.* 135, 137 (App.Div.), certif. den., 65 *N.J.* 292 (1974). Second, and more significant, the builder's remedy itself has never been made part of the constitutional obligation. In *Mount Laurel II* we noted that the concept of a "developing municipality," whereby only municipalities so characterized had a *Mount Laurel* obligation, was not of constitutional dimension. It was simply a method for achieving the "constitutionally mandated goal" of providing a realistic opportunity for lower income housing needed by the citizens of this state. As we there stated:

> [T]he zoning power that the state exercised through its municipalities would have constitutional validity only if regional housing needs were addressed by the actions of the municipalities in the aggregate. The method selected by this Court in *Mount Laurel I* for achieving that constitutionally mandated goal was to impose the obligation on those municipalities that were 'developing.' Clearly, however, the method adopted was simply a judicial remedy to redress a constitutional injury. Achievement of the constitutional goal, rather than the method of relief selected to achieve it, was the constitutional requirement. [92 *N.J.* at 237.]

That remains the law. It is the *goal* of *Mount Laurel II* that is of constitutional dimension, the provision of a realistic opportunity for lower income housing by the combined actions of the various governments in the State of New Jersey, leading to a satisfaction of the statewide need. Just as the "developing municipality" concept ceased, through our decision, to be acceptable (in its place we used the State Development Guide Plan), so the builder's remedy has, for the time being, ceased to

be acceptable by virtue of the action of the Legislature impos-
ing a moratorium.

It is also asserted that the Act simply will not achieve the
construction of lower income housing, the claim not being that
there will be a delay, but that there will be no such housing.
The argument has as its premises that the Act depends on the
voluntary cooperation of municipalities, that the lack of an
assured builder's remedy will result in a total loss of interest on
the part of builders, which in turn will mean that there will be
no construction, and, ultimately, that there will never be lower
income housing through any device other than a builder's
remedy. If true, this attack is substantial. Right now, how-
ever, it is speculation. At this point, the presumption of consti-
tutionality must prevail. The judiciary must assume, if the
assumption is at all reasonable, that the Act will function well
and fully satisfy the *Mount Laurel* obligation. That need not
be a certainty. But before this Act may be declared *un*
constitutional on these grounds, the contention that it will *not*
work must be close to a certainty. *See Brunetti v. New
Milford, supra,* 68 *N.J.* at 599 (a legislative enactment will not
be declared void unless its "repugnancy to the Constitution is
so manifest as to leave no room for reasonable doubt." *Id.*).

The Fair Housing Act has many things that the judicial
remedy did not have: it requires, in every municipality's master
plan, as a condition to the power to zone, a housing element
that provides a realistic opportunity for the fair share; it has
funding; it has the kind of legitimacy that may generate
popular support, the legitimacy that comes from enactment by
the people's elected representatives; it may result in voluntary
compliance, largely unachieved in a decade by the rule of law
fashioned by the courts; it incorporates what will be a compre-
hensive rational plan for the development of this state, autho-
rized by the Legislature and the Governor for this purpose; and
it has all of the advantages of implementation by an administra-
tive agency instead of by the courts, advantages that we
recognized in our *Mount Laurel* opinions. In many respects

the Act promises results beyond those achieved by the doctrine as administered by the courts. For that reason, we doubt that builders will lose all interest.

Finally, various parties assert that the Act is unconstitutional, in whole or in part, because it interferes with this Court's exclusive control over actions in lieu of prerogative writs. The New Jersey Constitution explicitly provides:

> Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, as of right, except in criminal causes where such review shall be discretionary. [*N.J. Const. of 1947* art. VI, § V, para. 4.]

On' its face, this constitutional provision grants to all individuals a review "as of right," in the Superior Court in any situation where, prior to 1947, they may have been entitled to a prerogative writ; and so the provision has been interpreted consistently. *See, e.g., In re Livolsi,* 85 *N.J.* 576, 593 (1981); *Ward v. Keenan,* 3 *N.J.* 298, 303–05 (1949).

The essence of the present challenge to the Act under this constitutional provision is that the Legislature interfered with this Court's function by dictating the manner by which an action in lieu of prerogative writs may be maintained or the scope of the relief that a court may afford a party suing in lieu of prerogative writs. Specifically, these parties challenge the burden of proof established for judicial proceedings, § 17, and the moratorium on any judicial grant of a builder's remedy. § 28.

In the instant setting, the relevant prerogative writ—*i.e.,* the writ that would have been available to parties challenging a municipal ordinance prior to 1947, and therefore the writ now superseded and protected by our Constitution—is that of *certiorari. In re Livolsi, supra,* 85 *N.J.* at 594 & n. 18.[12] *Certiora-*

---

[12]The three other prerogative writs—*mandamus, prohibition,* and *quo warranto*—are not, by their nature, applicable to actions challenging zoning ordinances. *See Livolsi,* 85 *N.J.* at 594 n. 18.

*ri* has long been available in New Jersey to afford judicial review of administrative agency actions in general and of municipal ordinances in particular. *See, e.g., Hill v. Borough of Collingswood,* 9 *N.J.* 369, 377 (1952); *Fischer v. Township of Bedminster,* 5 *N.J.* 534, 540 (1950). Thus, all of the plaintiffs in the cases before us would appear to have a constitutional right, under Article VI, section V, paragraph 4, to judicial review of the municipalities' ordinances.

We do not find that the Act has interfered impermissibly with this right to judicial review. Nothing in the Act precludes judicial review of an ordinance once the Council has acted on it or if a municipality is sued before it has acted, as provided in section 9b.

The burden of proof imposed by section 17 on any party challenging Council-approved housing elements and ordinances does not violate that party's right to review under the Constitution. In the first place, *certiorari* is an "extraordinary common-law remedy of ancient origin," limited to correction of *illegal* administrative actions. *McKenna v. New Jersey Highway Auth.,* 19 *N.J.* 270, 274–75 (1955). We will not extend this extraordinary remedy to bestow on the judiciary the power to prohibit needed legislative solutions of constitutional deprivations. The presumption of correctness attached to the Council's determinations by virtue of section 17 will not strip the judiciary of its historic powers to invalidate illegal—let alone unconstitutional—actions; individuals will continue to be protected against invalid ordinances. The standard of section 17 is not different in kind from the general rules, often stated in our opinions, that administrative agency actions are presumed to be valid, and that the burden of proving otherwise is on those challenging such action. *See, e.g., Dougherty v. Human Servs. Dept.,* 91 *N.J.* 1, 6 (1982). We have also stated that "[d]eference to an administrative agency is particularly appropriate where new and innovative legislation is being put into practice." *Newark Firemen's Mut. Benevolent Ass'n v. Newark,* 90 *N.J.*

44, 55 (1982). Certainly, the legislation before us is new and innovative, and we stand ready to defer, not only to the Legislature, as we do today, but also to the Council, when that body begins to act, at least until "clear and convincing evidence" leads us to a different course.

■ There is the further suggestion that section 28, by imposing a moratorium on the judicial granting of builder's remedies, violates Article VI by usurping the judiciary's exclusive powers to prescribe the *relief* granted in any action in lieu of prerogative writs. It is true that in *Fischer v. Township of Bedminster, supra,* 5 *N.J.* at 541, we stated that: "Neither the exercise of the power inherent in the old Supreme Court by means of the prerogative writs nor the regulation of the remedy is subject to legislative control." Relying in part on this language, one of the trial judges below intimated that the builder's remedy moratorium would be unconstitutional because Article VI, section V, paragraph 4 prohibits legislative interference with judicial remedies.

We are not persuaded. First, *Fischer* involved a situation wherein a legislative action—changing a statute of limitations—would have completely foreclosed judicial review. Without passing on *Fischer*'s continued vitality, we note that no such total preclusion of review is at issue here, as we stated above. Second, the history behind the 1947 Constitution makes clear that the word "relief" in Article VI, section V, para. 4 was included to refer to "actions of original jurisdiction, such as mandamus and quo warranto," *N.J. Const. Convention of 1947,* Vol. IV, at 538 (Comments of Herbert J. Hannoch); in the case of *certiorari,* judicial review *is* the relief granted, with the concomitant power in the courts to invalidate an administrative action. Finally, and most importantly, we have never elevated the judicially created builder's remedy, in particular, to the level of a constitutionally protected right.

■ Both in *Mount Laurel II* and again today we have asserted that the vindication of the *Mount Laurel* constitution-

al obligation is best left to the Legislature. Legislative action *was* the "relief" we asked for, and today we have it. The Constitution allows "review, hearing and relief" "on terms and in the manner provided by rules of the Supreme Court." *N.J. Const. of 1947* art. VI, § V, para. 4. Even if this language gave us the power to require a builder's remedy in certain or all cases—which construction we doubt seriously—we would not now choose to exercise it. As a matter of comity, we would yield to the Legislature in this field even if theoretically its exercise of power was in an area reserved to the judiciary. *See, e.g., Knight v. Margate,* 86 *N.J.* 374, 390–91 (1981) (this Court has authority "to permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area").[13]

## V.

### The Transfer Motions

All of the appeals before us, except one, are taken by municipalities from the trial courts' denial of their motions to transfer *Mount Laurel* litigation to the Council. In the *Tewksbury* case, the one exception, the developer is appealing from the trial court's grant of a motion to transfer the litigation to

---

[13]Other constitutional attacks asserted by various parties are either without merit or premature, or both. We agree generally with Judge Skillman's treatment, in *Morris County Fair Housing Council v. Boonton Township,* 209 N.J.Super. 393 (Law Div.1985), of the attack on the definition of region (§ 4b) (at 421–425); the requirement that the Council must consider development applications in projecting housing needs (§ 4j) (at 426–427); the adjustment of fair share (§ 7c(2) (b, g & e) (at 427–429); the crediting of "current" lower income housing against the fair share (at 429–430); the transfer of part of one municipality's fair share to another (at 431–432); the repose from further litigation after settlement (§ 22) (at 432–433); and the Council's alleged lack of power to require a builder's remedy or its equivalent (at 433–434). Furthermore, we find without merit the argument that the builder's remedy moratorium violates due process.

the Council. Section 16 of the Act governs the issue and is here set forth in full in a manner that indicates its "original" form (the Senate substitute for two bills) along with its ultimate form resulting from an amendment in the course of passage: [14]

For those exclusionary zoning cases instituted more than 60 days before the effective date of this act [no exhaustion of the review and mediation procedures established in sections 14 and 15 of this act shall be required unless the court determines that a transfer of the case to the council is likely to facilitate and expedite the provision of a realistic opportunity for low and moderate income housing] *any party to the litigation may file a motion with the court to seek a transfer of the case to the council. In determining whether or not to transfer, the court shall consider whether or not the transfer would result in a manifest injustice to any party to the litigation.* If the municipality fails to file a housing element and fair share plan with the council within [four] *five* months from the date of transfer, or promulgation of criteria and guidelines by the council pursuant to section 7 of this act, whichever occurs later, jurisdiction shall revert to the court.

b. Any person who institutes litigation less than 60 days before the effective date of this act or after the effective date of this act challenging a municipality's zoning ordinance with respect to the opportunity to provide for low or moderate income housing, shall file a notice to request review and mediation with the council pursuant to sections 14 and 15 of this act. In the event that the municipality adopts a resolution of participation within the period established in *subsection a. of* section 9 of this act, the person shall exhaust the review and mediation process of the council before being entitled to a trial on his complaint.

■ While this section could be read as committing the transfer issue to the general discretion of the trial court, the confinement of that court's consideration of "manifest injustice" to such injustice caused only by *transfer* (and not by non-transfer) along with the Act's clear and strong preference for Council rather than court treatment (the "preference" is set forth explicitly in section 3; the Act as a whole is better described as a "mandate" for administrative resolution), persuades us to adopt a different reading. Section 16a, we conclude, means that transfer *must* be granted unless it would result in manifest injustice to any party to the litigation.

---

[14]Bracketed material was eliminated and italicized material added by amendments in the course of passage. While the first paragraph is not so labeled, it will be referred to as section 16a.

All of the cases before us were commenced more than 60 days before the effective date of the Act and hence are governed by section 16a. The propriety of their transfer, therefore, is determined by the meaning of "manifest injustice to any party to the litigation." The two *Mount Laurel* judges in the cases before us ruled that a balancing of all relevant factors was needed to determine "manifest injustice." We disagree. The purposes and legislative history of the Act convince us that the Legislature intended *all* pending *Mount Laurel* cases to be transferred, except where unforeseen and exceptional unfairness would result.

■ Specifically we conclude that "manifest injustice" should not be determined in the same way a court decides whether to transfer *any* kind of case to an administrative agency; nor should it be determined by balancing the injustice done by granting transfer against that done by denying transfer. The standard that we adopt measures *only* the injustice caused by transfer and precludes transfer only if that injustice is unforeseen and exceptional.

■ The legislative history of the Act makes it clear that it had two primary purposes: first, to bring an administrative agency into the field of lower income housing to satisfy the *Mount Laurel* obligation; second, to get the courts out of that field.

One of the two Senate Bills. (S–2046) that were the predecessors to the Senate Committee's substitute that ultimately became the law allowed for a transfer, in the Court's discretion, to be exercised after considering five factors: the age of the case, the amount of discovery and other pretrial procedures that have taken place, the likely date of trial, the likely date by which administrative mediation and review can be completed, and "whether the transfer is likely to facilitate and expedite the provision of a realistic opportunity for low and moderate income

housing."[15] The Senate Committee substitute changed the transfer provision into that found *supra* at 48, the change prohibiting transfer unless it "is likely to facilitate and expedite the provision of a realistic opportunity for low and moderate income housing." The five factors were reduced to one, and only one. The burden was on the party seeking the transfer to prove the factor's existence. The municipality had to persuade the court that the transfer would facilitate and expedite lower income housing.

The passage of the Bill in that form became the subject of controversy. The Legislature, presumably aware that some municipalities were on the brink of the award of a builder's remedy, changed the transfer provision so that the burden of proof was on the party *opposing* transfer, not on the municipality but on the plaintiff, and that burden was specifically to prove that the transfer "would result in a manifest injustice to any party to the litigation."

The factor eliminated from consideration was the "facilitation" of lower income housing caused by transfer; it had been the presence of that factor, and no other, that would *require* transfer. Before the amendment the presumption was *against* transfer, proof of "facilitation" of lower income housing being required to obtain transfer; after the amendment, the presumption was *in favor* of transfer, proof of manifest injustice being required to prevent it. Furthermore, there was no longer a balancing of numerous factors. The elimination of the explicit standard of expediting lower income housing demonstrates the Legislature's awareness of the transfer's effect on the timing of lower income housing construction and the delay in such construction that would be caused by transfer. While the impact of transfer on lower income housing was to be

---

[15]The other predecessor Bill (S–2334), emphasizing a regional planning approach to the *Mount Laurel* issue, is structured in a way that does not require dealing with the transfer problem.

considered—and practically all parties agree on that [16]—the *delay* in producing lower income housing could not constitute "manifest injustice." That delay, which had previously been the *sole* factor, was eliminated and replaced by "manifest injustice." Hence the interpretation by the trial courts of "manifest injustice" that, in effect, made delay in providing lower income housing the *critical* factor is incorrect.

It should be emphasized that most pending *Mount Laurel* litigation is covered by section 16a, the "manifest injustice" section. It is therefore strongly inferable that the dominant intent underlying this section was that "manifest injustice" would be confined to the very narrowest, most extreme situation. It is clear that the Legislature never intended the use of its "manifest injustice" standard to create the risk of the wholesale non-transfer of cases that has occurred in these appeals.

It would be ironic if the application of this Act, so long in coming, so outstanding compared to the inactivity of other states, were to be characterized as "manifest injustice" simply because, in the most limited circumstances, its remedy was not immediate; and ironic to label the inevitable initial delaying effect of this law, so manifestly just in its unprecedented attempt to provide lower income housing, as manifestly unjust in that very respect.

The municipalities of this state, and the State itself, are about to have the benefit of a coherent, consistent plan to provide a realistic opportunity for lower income housing. That legislative solution may work well. It certainly may differ from the prior judicial solution. Regions, regional need, fair share, all may be different; the locus of the obligation may be different; the timetable different; the method of satisfying the obligation

---

[16]We therefore do not address the substantial argument that by using the phrase "manifest injustice *to any party to the litigation*," the Legislature intended to foreclose any consideration of the transfer's effect on lower income citizens.

different; and compliance may in fact become voluntary. As lower income housing is produced, the state will be developed in accordance with a rational comprehensive land-use state plan. It may be that the method of providing lower income housing will be more effective both in the total output and the speed of construction. When all of the standards of the Council are in place, *Mount Laurel* cases may move expeditiously: the expertise of administrators, and their power to make decisions binding on all municipalities, and to modify them, has a potential of being significantly more effective than case-by-case judicial disposition.

It was the State's intention that every municipality would have the benefit of this comprehensive plan and its method of implementation. If any municipality does not receive the plan's benefit, it will be deprived, and the statewide legislative solution will be impaired.

Given the potentially substantial scope of the differences between the *ad hoc* compulsion of builder's remedies and the effectuation of a comprehensive state plan, and the importance of allowing this plan to take effect, it is clear that some added delay in providing lower income housing could not have been intended to be included within the meaning of "manifest injustice." There was an obvious risk that such housing mandated by the former judicial remedy might directly conflict with the comprehensive state plan that had not yet been drawn up. From the Legislature's view, the delay in effecting a builder's remedy was not only *not* manifestly unjust, but it was probably thought wise, and, in any event, was manifestly intended. Whatever else might have been intended to be included in determining "manifest injustice," the delay in a builder's remedy was not. That delay the Legislature most certainly *sought,* as evidenced by the builder's remedy moratorium.[17]

---

[17]Most of the parties before us have concluded that the builder's remedy moratorium would apply to cases where transfer has been denied, and we

Some plaintiffs have also contended that bad faith is either an element of "manifest injustice" or that, even by itself, such bad faith might constitute "manifest injustice" sufficient to disallow transfer in certain cases. From the point of view of the State, however, instances of bad faith are irrelevant. The Legislature determined that the goals of the Act were so important that it should, in effect, be given retroactive force by the transferring of preexisting litigation to the Council. The importance of these legislative objectives forecloses a result that would deprive a municipality and its citizens of the Act's benefits because of the asserted bad faith of a municipal official.

Our conclusion is that the Legislature intended to transfer *every* pending *Mount Laurel* action to the Council. The exception, where "manifest injustice" would occur, was based on the Legislature's concern that in some particular case, there might be a combination of circumstances, unforeseen but nevertheless possible, that rendered transfer *so* unjust as to overcome the Legislature's clear wish to transfer all cases. Thus, not confident of their knowledge of the specific facts of each of these cases, legislators provided that transfer could be defeated upon the showing of "manifest injustice." In our view, then, the Legislature did not contemplate any particular class of cases or any particular characteristic as preventing transfer. The essence of the "manifest injustice" standard is its exclusion of the foreseen consequences, some undoubtedly unfair, of transfer. The legislative intent was that only unforeseen and exceptional unfairness would warrant the denial of a transfer motion.

concur. As a practical matter, then, even were transfer to be denied, the provision of lower income housing would be delayed up to a year. This consequence considerably dilutes the urgency that is the main basis for arguing against transfer.

None of the consequences brought to our attention in the cases before us meets that standard. Delay in the production of housing, loss of expected profits, loss of the builder's remedy, substantial expenditure of funds for litigation purposes, permit applications, on-site and off-site tract improvements, purchase of property or options at an inflated price, contractual commitments: all of these were no doubt foreseen by the Legislature, were the likely consequences of transfer, and were not intended to constitute "manifest injustice." And, although different in kind, the loss to various public interest groups and their counsel of a goal they have sought for many years, fought for for many years, and finally just about attained, that loss was similarly foreseen. While its personal impact is much clearer, since we can identify the very people who are affected, its position in the hierarchy of interests falls far below that of the lower income housing that has been delayed, a delay that we have determined was not intended to constitute "manifest injustice."

The impact of transfer on a builder, of course, is somewhat different. The builder's loss of expected profits is discordant, under these circumstances, with the connotations of "manifest injustice." That loss is a risk to which builders are regularly exposed in a variety of circumstances.

It has been suggested that there is a different kind of injustice here, for, as some have put it, this Court in *Mount Laurel II* "invited" the builders to bring these suits, solicited the "help" of the builders in our effort to vindicate the constitutional obligation. In effect, we are said to have asked them to join in a struggle to vindicate a constitutional interest. Those assertions remind us of the opposite claim, which is that we invented the remedial doctrine not for the benefit of the poor, but for the benefit of the builders. The truth is that we devised a remedy that we believed would be effective. We concluded that if it were possible for builders to profit from lower income housing, they would pursue it, and further concluded that such pursuit was likely to increase compliance with *Mount Laurel.*

We did not "hope" the builders would join in this effort, we expected that they would.

Nevertheless there is an obvious basis to a builder's claim that pursuit of this litigation was justifiable, but if that suggestion is intended to create the image of an estoppel, there is no substance to it. If there is any class of litigant that knows of the uncertainties of litigation, it is the builders. They, more than any other group, have walked the rough, uneven, unpredictable path through planning boards, boards of adjustments, permits, approvals, conditions, lawsuits, appeals, affirmances, reversals, and in between all of these, changes in both statutory and decisional law that can turn a case upside down. No builder with the slightest amount of experience could have relied on the remedies provided in *Mount Laurel II* in the sense of justifiably believing that they would not be changed, or that any change would not apply to the builders. If ever any doctrine and any remedy appeared susceptible to change, it was that decision and its remedy. The opinion itself constituted the strongest possible entreaty for legislative change.

We have attached an Appendix to this opinion indicating the factual circumstances of all of the other cases before us on this appeal. None of them includes unforeseen loss amounting to exceptional unfairness. No "manifest injustice" will result from their transfer.[18]

There is one possible consequence of transfer, however, that we believe the Legislature did not foresee, one that it would have intended to constitute "manifest injustice," a consequence that would probably be constitutionally impermissible. We refer to a transfer that does not simply *delay* the creation of a reasonable likelihood of lower income housing but renders

---

[18]We fully understand that given the standard set forth in this opinion, it is most unlikely that "manifest injustice" will ever be proven in any of these cases. Certainly on the record before us, it has not been.

it practically impossible. That result would warrant, indeed require, denial of transfer. It does not exist in any of the cases before us, and its occurrence is made even less likely by our decision permitting the imposition of appropriate conditions on transfer. *See* Part VII, *infra* at 61.

We do not exclude the possibility that there might be some other consequence or loss that may amount to "manifest injustice." Like the Legislature, we too cannot anticipate every conceivable set of circumstances that may affect a transfer motion.

We therefore order that all cases before us be transferred to the Council, subject to the conditions mentioned *infra* at 61–63.

## VI.

### Interpretation of Certain Provisions of the Act

There are certain provisions of the Act that should be clarified and interpreted for the benefit of both the Council and those parties whose interests may be affected by the Act. Many of the matters mentioned in this section are not strictly before us for determination. Nevertheless, arguments have been addressed to them as being relevant to the legal effect and constitutionality of this new legislation.

A. Powers of Council.

The basic power of the Council is to grant or withhold substantive certification; the Council also has the further power to impose conditions on its grant and the implied power to accelerate its denial. We believe that the Council may use its power to grant or deny substantive certification in a multitude of ways in order to accomplish its mission of bringing about statewide compliance with the *Mount Laurel* obligation. That power is considerable, since denial of substantive certification may result in *Mount Laurel* litigation brought by a builder, a

consequence that the Act was designed to avoid and that most municipalities want to avoid.

 The Council has the implicit power to condition substantive certification on the inclusion of ordinance provisions for "mandatory set asides or density bonuses." § 11a(1). The power of a municipality to include such provisions in its housing element, indeed the *requirement* that it *must* consider them is explicit, *id.* ; the sense and structure of the Act necessarily implies the power of the Council, in an appropriate case, to condition substantive certification on such inclusion.

Accelerated denial of substantive certification would presumably be reserved for a specific kind of case, one where the circumstances strongly persuaded the Council that its role in achieving compliance with *Mount Laurel* called for such unusual action on its part.

 The Council may have the power, once its jurisdiction is invoked, to require the municipality to pursue substantive certification expeditiously and to conform its ordinances to the determination implicit in the Council's action on substantive certification.[19] While the language of the statute could support a contrary conclusion, that conclusion would allow a municipality to use all of the energies of the Council, presumably for the purpose of determining its *Mount Laurel* obligation through the Council rather than the courts, all the way up to the point

---

[19]The question here is whether a municipality can withdraw from the Council's jurisdiction once it has been brought before the Council, either on its own petition or motion (and in that connection a municipality's successful transfer motion shall be regarded as a petition for substantive certification), or on the petition of a party to litigation pursuant to section 16; or must it pursue the matter, and if substantive certification is granted, adopt the fair share ordinances that were submitted to the Council pursuant to section 9 and that resulted in substantive certification; or if substantive certification is granted on condition, then must the municipality revise the fair share ordinances to conform to that condition and adopt them; and if substantive certification is denied, must the municipality revise its fair share ordinances to conform to the requirements that are implicit in the denial so as to produce fair share ordinances that will result in substantive certification.

at which substantive certification is about to be determined, and then to withdraw from the matter. While we do not pass on this question for all cases, it seems clear to us that all of the cases before us today fall into a special class: practically all of them have been in litigation for a considerable period of time; the cost of this litigation has been considerable, the proceedings often complex, and in many cases the ultimate disposition is not too far off; furthermore, the prospect of producing lower income housing is likely. Under those circumstances, the use by any of these municipalities before us today of the procedures of the Council without thereafter complying with the Council's determination would constitute a gross perversion of the purposes of the Act, as well as an imposition on both the courts and the Council. It would be beyond the understanding of any citizen if our system of government allowed a municipality, about to conform to the requirements of our Constitution after years of litigation for that purpose, to have its case transferred to an administrative agency, allegedly for the purpose of meeting that same constitutional obligation in a different, yet permissible way, and thereafter, at the last moment, several years later, simply to walk away and say, in effect, "I choose not to comply with either the courts or the administrative agency set up by the Legislature." We believe the Legislature never intended such a result and presume the Council will not permit it.

B. Effect of Judicial Proceedings.

While the Act requires the Council to "give appropriate weight to ... decisions of other branches of government", § 7, in carrying out its duties, including its determination of housing regions, present and prospective lower income need, its promulgation of criteria and guidelines for determining municipal fair share, and its provision of population and household projections, there is no similar express requirement in connection with any particular municipal proceeding before the Council. The Act does not deal expressly with the question of what force and

effect, if any, are to be given to prior determinations in a particular *Mount Laurel* litigation after its transfer to the Council.

Where no final judgment has been entered, we believe the Council is not bound by any orders entered in the matter, all of them being provisional and subject to change, nor is it bound by any stipulations, including a municipality's stipulation that its zoning ordinances do not comply with the *Mount Laurel* obligation. The administrative remedies, and the administrative approach to that subject, may be significantly different from the court's. Fair share rulings by the court, provisional builder's remedies, site suitability determinations—all of these may not be in accord with the policies and regulations of the Council. Similarly, stipulations in *Mount Laurel* matters were undoubtedly based on the assumption that the issues would be determined by the court in accordance with *Mount Laurel II.* They presumably represented the litigant's belief that what was being stipulated would be adjudicated in any event. It is not only, in a sense, unfair to the litigant to be bound by these interim adjudications and stipulations, it would also be inconsistent with the purposes of the Act, for these determinations and stipulations may be inconsistent with the comprehensive plan of development of the state and the method of effectuating it.

In this regard, we note that general principles of law have long held that *res judicata* is applicable only when a final judgment is rendered, and the doctrine of collateral estoppel applies whenever an action is "sufficiently firm to be accorded conclusive effect." *Restatement (Second) of Judgments,* § 13 at 132. But this Court has also stated that collateral estoppel "is not mandated by constitution or statute" and is "a doctrine designed to accomplish various goals, a rule not to be applied if there are sufficient countervailing interests." *Matter of Coruzzi,* 95 *N.J.* 557, 568 (1984). On this difficult issue, and faced with this unprecedented Act, we conclude that there are sufficient "countervailing interests"—in the form of the Council's

need for flexibility, and the State's need for uniformity—to free the administrative agency of the requirements of collateral estoppel. At the same time, we underscore that the agencies now involved in this field are free to use the records developed in litigation, including any interim orders or stipulations entered, for such purposes as they deem appropriate. We note that the Rules of Evidence, *per se*, will not apply in administrative proceedings under the Act. *See N.J.S.A.* 52:14B–10. Thus, again, technical legal rules will neither compel nor preclude the Council or the Administrative Law Judges hearing cases under section 15 from considering the records already developed in court proceedings.

C. Moratorium on Builder's Remedies.

As we now view the matter, the moratorium on builder's remedies, § 28, is of limited importance. Since it applies only to "litigation," it does not apply to matters that are before the Council. And while it applies to all pending litigation (except litigation commenced before January 20, 1983, the date of *Mount Laurel II* ), all of that litigation may be transferred to the Council. Assuming that there is nevertheless some litigation subject to the moratorium that is not transferred to the Council, the moratorium applies and its effect is to prevent not only the direct grant of a builder's remedy to a particular plaintiff, but an indirect grant that achieves the same result, whether intended or not. For example, as to that case and for the limited period (up to January 1, 1987), a court may not require the inclusion of a mandatory set aside zone within an ordinance if the effect is substantially the same as the grant of a builder's remedy, even though the beneficiary of that zone may not be a party to the litigation. Given this very minimal effect, we will not further dwell on section 28.

D. Power to Promulgate Rules.

Section 8 gives the Council express power to adopt procedural rules in accordance with the Administrative Proce-

dure Act. Section 6a gives the Council power to "establish, and from time to time alter, such plan of organization as it may deem expedient." And section 7c, discussed above, gives the Council power to "adopt criteria and guidelines." Implicit in these provisions—indeed, implicit throughout the entire Act, whose purpose is in part to create an agency capable of overseeing the continuing resolution of a monumental social task—is the power, in the Council, to promulgate whatever rules and regulations may be necessary to achieve its statutory task. *See, e.g., A.A. Mastrangelo, Inc. v. Environmental Protection Dept.,* 90 *N.J.* 666, 683–84 (1982) ("absence of an express statutory authorization will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation").

## VII.

### Conditions on Transfer

We have concluded that the Council has the power to require, as a condition of its exercise of jurisdiction on an application for substantive certification, that the applying municipality take appropriate measures to preserve "scarce resources," namely, those resources that will probably be essential to the satisfaction of its *Mount Laurel* obligation. In some municipalities it is clear that only one tract or several tracts are usable for lower income housing, and if they are developed, the municipality as a practical matter will not be able to satisfy its *Mount Laurel* obligation. In other municipalities there may be sewerage capacity that, if used, will prevent future lower income housing, or transportation facilities, or water lines, or any one of innumerable public improvements that are necessary for the support of housing but are limited in supply. It is only after a careful examination of the many circumstances that surround such matters that one can make an informed decision

on whether further development or use of these facilities is likely to have a substantial adverse impact on the ability of the municipality to provide lower income housing in the future.

Since the Council will not be able to exercise its discretion until it has done the various things contemplated in the Act, for which a period of seven months has been allowed, we believe the Act fairly implies that the judiciary has the power, upon transfer, to impose those same conditions designed to conserve "scarce resources" that the Council might have imposed were it fully in operation. Practically all of the parties before us, on both sides, including counsel for the legislative members and the Attorney General, as well as the Public Advocate, have agreed that we have this power and that we should exercise it.

We would deem it unwise to impose specific conditions in any of these cases without a much more thorough analysis of the record, including oral argument in each case on what conditions would be appropriate. "Appropriate" refers not simply to the desirability of preserving a particular resource, but to the practicality of doing so, the power to do so, the cost of so doing, and the ability to enforce the condition. Some cases may require further fact-finding to make these determinations. For those reasons, we decline to impose any such conditions directly. As to any transferred matter, any party to the action may apply to the trial court (which shall retain jurisdiction for this limited purpose) for the imposition of conditions on the transfer. Notice of such application shall be given within 30 days of today's decision. Those conditions should be designed not for the protection of any builder, but for the protection of the ability of the municipality, pending the outcome of the Council proceedings, to provide the realistic opportunity for lower income housing, as it may be required to do in the near future. It would not, for instance, be in accord with our intention to require that a particular tract not be developed for a certain period (simply because that is the tract selected by the builder-plaintiff) if the fact is that there are innumerable

tracts that will serve the same purpose even if that particular tract is developed. As stated before, these conditions are not for the benefit of any builder, but simply designed to protect and assure the municipality's future ability to comply with a *Mount Laurel* obligation. Whether, and to what extent, such protection is necessary or desirable may depend on various factors, including the likelihood that the municipality will actively try to preserve—or dissipate—such scarce resources. Therefore, in determining the need for and scope of such conditions, the trial court may consider, among other factors, the previous actions of a municipality and its officials.

## VIII.

### Conclusion

By virtue of the Act, the three branches of government in New Jersey are now committed to a common goal: the provision of a realistic opportunity for the construction of needed lower income housing. It is a most difficult goal to achieve. It is pursued within an even larger context, for the implications of the State Development and Redevelopment Plan legislation indicate significant movement by the State in the direction of regional planning.

This Court will do its proper share in this cooperative effort. While the Legislature has left a continuing role under the Act for the judiciary in *Mount Laurel* matters, any such proceedings before a court should conform wherever possible to the decisions, criteria, and guidelines of the Council. We do not believe the Legislature wanted lower income housing opportunities to develop in two different directions at the same time, contrary to sound comprehensive planning. In that connection, courts will, pursuant to section 16b, transfer to the Council any *Mount Laurel* action hereafter commenced except where the Act clearly calls for retention (such as the petition for a declaratory judgment referred to in Section 13).

We have been criticized strongly for activism in this most sensitive and controversial area. We understand that no one

wants his or her neighborhood determined by judges. Our reasons for "activism," if that is what it was, are fully set forth in *Mount Laurel II*. We note only that for the many years from the day of *Mount Laurel I* to the day of *Mount Laurel II* there was no activism, and there was no legislation, no ordinances, and no lower income housing.

*Mount Laurel II* will result in a fair amount of low and moderate income housing. When various settlements are implemented, the effectiveness of the decision will become more apparent. As of the time we entertained oral argument on the cases before us (January 6 and 7, 1986), some twenty-two *Mount Laurel* cases had reached virtually final settlement. The total fair share under those settlements was in excess of 14,000 units: given the terms of these settlements, it is highly probable that a substantial portion will be built. Given the sensitivity and dedication of the three *Mount Laurel* judges, we have no doubt that our directions in *Mount Laurel II* were honored scrupulously and that every development they allowed substantially conformed to sound zoning and planning and would have no substantial adverse environmental impact. The earlier hope that these three judges would soon develop a degree of consistency, uniformity and a common approach to the definition of region, the calculation of regional need, and the allocation of that need into municipal fair shares has been fully realized.

We would be remiss in not recognizing the very substantial contributions that the *Mount Laurel* judges have made in the interest of the just resolution of *Mount Laurel* cases. Their innovative refinement of techniques for the process of litigation has given credibility to the implementation of the *Mount Laurel* doctrine. Measured against one criterion, the advancement of the public interest, their achievements were extraordinary. The three oldest exclusionary zoning cases in the state have been settled. Judge Gibson, on September 6, 1985, approved a final settlement in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, which gave Mount Laurel Township

a six-year judgment of repose. Another of the *Mount Laurel II* cases, *Urban League of Essex County v. Township of Mahwah*, 92 *N.J.* 158, 332 (1983), which this Court recognized had been going on "for more than a decade," was settled this year. Likewise, the *Bedminster* litigation, filed in 1971, is now resolved; Judge Serpentelli approved the settlement of this case and granted repose in *Alan Deane v. Bedminster*, 205 *N.J.Super.* 87 (Law Div.1985). Moreover, as Judge Skillman noted in his transfer decision, the Public Advocate reached settlements with all but two of the twelve Morris County defendants in *Morris County Fair Housing Council v. Boonton Township*, 209 *N.J.Super.* 393, 442 (Law Div.1985). Their work has required great intelligence, dedication, independence, and courage.

No one should assume that our exercise of comity today signals a weakening of our resolve to enforce the constitutional rights of New Jersey's lower income citizens. The constitutional obligation has not changed; the judiciary's ultimate duty to enforce it has not changed; our determination to perform that duty has not changed. What *has* changed is that we are no longer alone in this field. The other branches of government have fashioned a comprehensive statewide response to the *Mount Laurel* obligation. This kind of response, one that would permit us to withdraw from this field, is what this Court has always wanted and sought. It is potentially far better for the State and for its lower income citizens.

We therefore reverse the judgments below except for that in *Tewksbury*, which we affirm. All cases are hereby transferred to the Council subject to such conditions as the trial courts may hereafter impose, all in accordance with the terms of this opinion.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance—None.*

# APPENDIX

## HOLMDEL TOWNSHIP

The action against Holmdel Township's ordinance was initiated on February 28, 1984, by Real Estate Equities, and, on September 14, 1984, consolidated with actions by Palmer Associates and New Brunswick Hampton, Inc. On August 27, 1984, Holmdel adopted Ordinance 84–7 in an attempt to meet its *Mount Laurel* obligation. On September 20, 1984, a pretrial conference took place and a pretrial order was entered setting the matter for trial.

On October 10, 1984, Hazlet Township, adjacent to Holmdel, filed suit against Holmdel alleging that Ordinance 84–7 was an improper attempt by Holmdel to shift its fair share obligation to Hazlet. That matter has been proceeding with the original actions without a formal order of consolidation.

Trial on the fair share phase lasted from October 15 through October 25, 1984. On November 3, 1984, a Master was appointed, and on December 21, 1984, the Master filed a partial report to the court. A hearing on the Master's partial report was held on April 15, 1985, and on November 26, 1985, the Master filed a final report. The fair share obligation has not yet been determined.

On July 16, 1985, Holmdel filed a motion to transfer to the Council, which was heard on October 11, 1985, and was denied in a formal order dated October 28, 1985.

Hazlet, deciding that its action against Holmdel did not involve *Mount Laurel* litigation, has not participated in any of the transfer procedures. Hazlet's action remains pending a determination by the Council. This is essentially a non-*Mount Laurel* claim. We suggest that the Council formally notify Hazlet of any proceeding involving Holmdel, advise it of its possible effect on Hazlet's interests, and invite Hazlet to participate. We do not rule that upon such formal notice Hazlet will be bound by the Council's determination.

The "manifest injustice" claimed resulting from a transfer of the *Holmdel* matter includes the alleged delay in the construction of low and moderate income housing, the loss of municipal resources such as utility capacity, the increased infrastructure costs for developers, the loss of suitable building sites, the loss to low and moderate income people of the builders as a plaintiff class, and the increased costs to plaintiffs in time and money of submitting to the Council's process after litigation in the courts. Remaining in this matter is a determination of Holmdel's fair share obligation, drafting a new ordinance, holding a compliance hearing, redrafting the new ordinance, and adoption of the ordinance.

## WARREN TOWNSHIP

The Warren Township matter was initiated by AMG Realty Company on December 31, 1980. Skytop Land Corporation was permitted to intervene as an original plaintiff on May 19, 1981. Both plaintiffs own vacant developable land within Warren. In a trial on May 27, 1982, before *Mount Laurel II*, Warren's Ordinance 79-3 was declared invalid and the Township was ordered to rezone within nine months in accordance with *Mount Laurel I.*

After numerous public hearings, Warren adopted Ordinance 82-19 on or about December 2, 1982. On January 17, 1983, both plaintiffs in the original action were granted leave to file a supplemental complaint challenging the new ordinance, and asking for a direct rezoning of their land. The new ordinance was also challenged by Mr. and Mrs. Bojczak, seeking to rezone their land from a residential to a commercial use. Two other plaintiffs were allowed to intervent: Timber Properties, Inc., and Joan H. Facey. Timber Properties, Inc. (Timber), challenged Ord. 82-19, which prohibits Timber's residential development of certain land it holds as contract purchaser and equitable owner at a four unit per acre density. Timber also seeks a builder's remedy and alleges that adequate sewage

facility for its development is being denied arbitrarily by the Township Sewerage Authority. The Township, however, contends that Timber's request for additional sewerage capacity was too late since plans for the new sewerage plant were completed. A bid for construction of the new plant was granted on October 6, 1981. Joan H. Facey, *et al*, are landowners in Warren who seek to reverse the change in the zoning of their property to permit non-residential development. Under Ord. 82–19 the property was zoned for residential *Mount Laurel* development.

On July 16, 1984, after a twenty-one day trial, the trial court issued an opinion holding that Ord. 82–19 was unconstitutional. On August 1, 1984, the court, in an interim judgment, provided that (1) Warren Township's fair share obligation was 946 low and moderate income housing units; (2) the plaintiffs are entitled to a builder's remedy; (3) a Special Master should be appointed to assist in drafting a compliance ordinance; and (4) the Township must amend its zoning ordinance within 90 days of the opinion (a subsequent extension granted the Township until November 30, 1984).

In early December 1984, the Township adopted a newly revised ordinance. The Master, however, has not reported to the court on this ordinance. Remaining in this matter is the Master's review of the ordinance; holding a compliance hearing; preparing a further revised ordinance if necessary; and adoption of the new ordinance if necessary. The claims of "manifest injustice" resulting from a transfer to the Council include the alleged delay in the construction of low and moderate income housing; the loss of possible builder's remedy relief to the plaintiffs-developers; the curtailed ability of the plaintiff-developer, after years of litigation, to participate in or give input to the Council process; the increased costs for developers caused by delay; and the loss of the public interest incentive to achieve *Mount Laurel* housing. It is estimated that had a transfer not been granted, this case might have been completed at the trial level in approximately four months.

## FRANKLIN TOWNSHIP

This action against Franklin Township was filed on January 27, 1984, by J.W. Field Co., and was consolidated with ten subsequent actions against Franklin. On July 12, 1985, Van Cleef, one of the consolidated plaintiffs, filed a stipulation of dismissal, leaving ten actions consolidated in this matter.

After extensive discovery, trial commenced on September 10, 1984. On the first day of trial, Franklin conceded the facial invalidity of its pre-July 12, 1984, ordinance in order for the court to consider the validity of a new ordinance adopted on July 12, 1984. After a pretrial conference on July 20, 1984, a ten-day trial on the fair share issues was held, starting September 10, 1984. The court reserved judgment at the conclusion of the trial and appointed a Master to report on fair share issues to the court. On December 21, 1984, the Master rendered his report finding a fair share obligation between 2,625 and 2,679 units. On September 13, 1985, Franklin filed a motion for transfer to the Council pursuant to the Act. On October 7, 1985, the court in a partial judgment held that Franklin's prospective fair share obligation was 2,087 low and moderate income housing units, and directed the Master to prepare a report on the present need. On October 22, 1985, the Master submitted his report. On November 8, 1985, the motion to transfer was denied. On December 2, 1985, in a letter opinion, the trial court, after taking credit units into account, readjusted Franklin's fair share as a total of 1,715 units, not including present need.

The claims of "manifest injustice" include the delay in the implementation of the *Mount Laurel* constitutional mandate resulting in less affordable housing for lower income persons, increased financing costs to the builders in the future, continuing costs incurred by the builders to carry the land and insurance through the Council's process, duplication of litigation costs, and a lessening in the likely production of lower income housing.

Remaining in this case is a determination of the present fair share need, drafting a new ordinance, holding a compliance hearing, redrafting the ordinance if necessary, rehearing on compliance if necessary, and adoption of the ordinance.

## BOROUGH OF BERNARDSVILLE

This action challenging Bernardsville's zoning ordinance results from a complaint filed on June 20, 1983, by a Borough landowner who was refused rezoning to allow building a senior citizen housing project at a density of twelve units per acre on her land. The complaint sought a builder's remedy of twenty units per acre.

On August 3 and December 20, 1983, case management conferences were held, a Master was appointed, and after negotiations a partial settlement was executed in February 1984. The settlement awarded plaintiffs a builder's remedy fixing a density of nine units per acre for a total of seventy-six units and granted an immunity order, which has been continued to date. On January 14, 1985, the Borough presented its compliance plan. On February 7, 1985, a second report from the Special Master was submitted to assist the court in formulating the Borough's compliance package. On a March 18, 1985 public hearing, a new ordinance was adopted, and on April 30, 1985, a Master's report was submitted that supported the proposed compliance package. This new compliance package called for the Borough itself actually to build 178 lower income units.

To build the units, the Borough sought plaintiff's land. On August 21, 1985, plaintiff sought a declaratory judgment that under the circumstances Bernardsville did not have authority to condemn the land, and the Borough cross-moved to vacate plaintiff's builder's remedy. The trial court denied plaintiff's motion. The cross-motion was heard in conjunction with defendant's motion to transfer to the Council and is still undecided.

Remaining in this matter is the complete resolution of the cross-motions made in August, a compliance hearing, and if modified, readoption of the compliance package. The claim of "manifest injustice" resulting from a transfer to the Council includes the delay in providing lower income housing, the loss by plaintiff of a vested right in the builder's remedy, an inherent unfairness in the retroactive application of the Act, and the need for plaintiff to relitigate a remedy already consented to by the defendant with the attendant delay and expense.

## MONROE TOWNSHIP

This action challenging Monroe Township's zoning ordinance is part of the oldest pending *Mount Laurel* action, *Urban League of Greater New Brunswick, et al v. Carteret,* commenced on July 23, 1974. In *Mount Laurel II,* this Court affirmed the trial court's holding that Monroe's zoning ordinance was unconstitutional, and remanded for the determination of region, fair share, allocation, and compliance. On remand, plaintiff Monroe Development Associates filed a complaint in lieu of prerogative writ on December 2, 1983, which was consolidated with the original action. Also consolidated were two other actions filed on April 16 and May 4, 1984, on behalf of the other five plaintiffs-developers.

After extensive discovery and pretrial proceedings, an 18 day trial was held in April and May of 1984. The trial court issued a letter opinion on July 27, 1984, and entered judgment on August 13, 1984. The judgment declared Monroe's ordinance unconstitutional, directed rezoning to be completed within ninety days, and appointed a Master to assist in preparing the new ordinance. The Township's fair share was calculated at 774 units.

A compliance plan was not submitted to the court until March 29, 1985. The Township's Mayor refused to sign the proposed compliance plan, which was ultimately accepted by the court.

On May 13, 1985, the court entered an order directing Monroe to pay the court appointed Master and consultants. Monroe has refused to comply with the order, and appeals are pending on that order before the Appellate Division.

While Monroe's compliance plan was being considered by the Master, the Township Planning Board and Council voted to approve a new residential project without a *Mount Laurel* set-aside. On July 25, 1985, the court provided Monroe with two compliance options: either to rescind the new development's approval, or include 100 fair share units in the development. These options were rejected by the Township on August 2, 1985. The trial court then held Monroe's compliance plan void, and directed the Master to draft a plan by October 7, 1985.

In the interim, on August 5, 1985, Monroe adopted a new zoning ordinance permitting residential development without a set-aside. On November 18, 1985, the Monroe Planning Board granted approval for a residential housing project of approximately 700 units without a *Mount Laurel* set-aside.

As of December 4, 1985, the Master had not filed a report. Remaining in this matter is the receipt of the Master's report, a compliance hearing, any necessary court-ordered revisions, and adoption by the Township of the compliance plan. This could take from three to four months; however, given Monroe's actions to date, an appeal would be likely.

The claimed "manifest injustice" from a transfer to the Council in this case includes the delay in affording realistic housing opportunities to low and moderate income persons; the duplication and increase in litigation costs to the plaintiffs if forced to present their case anew before the Council; the time and money already expended by the developers in seeking a judgment; the loss to lower income persons of the plaintiff-developers as advocates of low and moderate income housing; the loss of municipal resources such as water and sewerage capacity that might be used up in the interim delay; the increased

infrastructure costs for developers, and the loss of suitable building sites.

## PISCATAWAY TOWNSHIP

This action also arises from the July 23, 1974, complaint by the Urban League. The pre-1983 procedural history is documented in the *Mount Laurel II* opinion where Piscataway's zoning ordinance was declared unconstitutional and the case remanded for trial on fair share issues. A nineteen-day trial was held in May 1984 to determine the fair share obligation of Piscataway and other defendant municipalities.

Piscataway's fair share was computed by a court-appointed Master at 3,744 units; since only 1,100 acres suitable for development remain in the Township, however, the court with the parties' agreement did not set that fair share obligation. Instead, the court ordered site specific hearings to determine the suitability of vacant land, and directed the Master to conduct a suitability analysis. The Master issued two reports indicating that approximately 40 sites were suitable for the construction of low and moderate income housing.

In February 1985, the court conducted a hearing on the Master's findings and the court's own on-site inspections. On July 23, 1985, the court determined that Piscataway's fair share was 2,215 units. Judgment was entered on September 17, 1985, a Master was directed to assist the Township in complying with its fair share obligation, and the Township was directed to revise its zoning ordinance within 90 days. In addition, the court continued a restraining order imposed on December 11, 1984, that prohibits the Township from issuing development applications on any of the forty sites deemed suitable for low and moderate income housing. Remaining in this case is the preparation of a compliance ordinance, the holding of a compliance hearing, necessary redrafting of the ordinance, and adoption of the new ordinance. The trial court estimates that it

would take approximately five months to complete these procedures.

Plaintiffs' claims of "manifest injustice" resulting from a transfer are the same as those described under *Monroe*.

## BOROUGH OF SOUTH PLAINFIELD

This matter also originates with the complaint filed by the Urban League of Greater New Brunswick on July 23, 1973. The Borough's zoning ordinance was held invalid in *Mount Laurel II*, and the case remanded for trial on fair share issues.

On May 10, 1984, at a joint trial following extensive discovery, South Plainfield and the Urban League stipulated the facts necessary for the court to determine fair share, ordinance validity, and the appropriate remedy. The stipulation stated that due to the lack of suitable land, the fair share obligation should be reduced to 900 units, consisting of 280 for present need and 620 for prospective need.

On May 22, 1984, a judgment was entered granting plaintiffs' motion for summary judgment and setting October 4, 1984, as the deadline for the Borough to adopt the necessary ordinance. The October 4, 1984, deadline was not met. On December 13, 1984, the court ordered the consolidation of this matter with an action challenging the Borough Board of Adjustment's denial of a senior citizens' project in the Elderlodge site. In that action after suit was instituted, the Board had granted a variance permitting the building of the senior citizen project that did not include any *Mount Laurel* set-asides. In the December 13, 1984, order, the court prevented the vesting of any rights of the *Elderlodge* plaintiff and directed the Borough to adopt a complaint ordinance by January 31, 1985. On July 3, 1985, responding to the Borough's sale of municipally owned parcels that were part of the original judgment, the trial court entered an order restraining the Borough of South Plainfield from approving any site plans or subdivision applications or variances, and from conducting any new municipal land sales, or consummat-

ing any pending land sales, at least until South Plainfield's adoption of the required ordinance.

On July 22, 1985, the Borough filed a motion to transfer the case to the Council. This motion was denied, and on August 7, 1985, South Plainfield adopted, under protest, a revised ordinance. A compliance hearing was scheduled for November 12, 1985, but subsequently adjourned until December 4, 1985, to permit the owner of the largest site affected to intervene. Remaining in this matter is a hearing on the adopted ordinance, any necessary redrafting and rehearing, and the adoption of the redrafted ordinance. Since the ordinance was adopted under protest, an appeal is likely.

The claims of "manifest injustice" attending a transfer of this case to the Council include those described in the discussion of the Monroe Township case.